In re Butler's Will.

In re Butler's Will.

*March 21—April 9, 1901.*

*Wills: Probate: Appeal: Executors: "Party aggrieved:" Evidence: Non-expert witnesses: Mental capacity: Undue influence.*

1. Where a judgment of the county court admitting a will to probate was reversed by the circuit court after the executor had qualified and entered upon the duties of his trust, the executor, in his official capacity, is aggrieved thereby, and is entitled to prosecute an appeal to vindicate and protect his trust.

2. Opinions of nonexpert witnesses as to a testator's mental capacity to make a will have little probative force, where the acts and conversations of the testator, on which such opinions are based, show merely mental eccentricities, as distinguished from weakness of mind or delusions affecting testamentary capacity.

In re Butler's Will.

3. The test as to whether a testator has sufficient mental capacity to make a will is not whether he did the best or the wisest or the theoretically just thing in his will, but, whether he had sufficient active memory to collect in his mind and comprehend, without prompting, the condition of his property, his relations to his children and other beneficiaries, and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other, and be able to form rational judgment in relation thereto.

4. In a contest over the probate of a will, the evidence — stated in the opinion — is *held* insufficient to show that the testator lacked mental capacity to make the will or that his free agency was destroyed or impaired by the influence of others.

APPEAL from a judgment of the circuit court for Waukesha county: JAMES J. DICK, Circuit Judge. *Reversed.*

This is a contest over the probate of the alleged will of William Butler, deceased. The contestants are adult children of the decedent, and they allege lack of mental capacity on the part of the deceased, as well as undue influence. The will was admitted to probate in the county court of Waukesha county, and the appellant, *Templeton,* who is named as executor in the will, duly qualified and received letters testamentary. Upon appeal to the circuit court the issues were tried by a jury, and the jury found that the testator lacked testamentary capacity, that he did not have knowledge of the terms of the will, and that the will was the result of undue influence. These findings were adopted by the circuit court, and the judgment of the county court admitting the will to probate was reversed, and the executor appeals.

There was no contest on the trial as to the execution of the will in proper form. The evidence showed that William Butler, the testator, was at the time of the execution of the will (January 24, 1900) a man past seventy-three years of age; that he was a farmer; and that for fifty years he had lived on his homestead, in Waukesha county, and had accumulated an estate of real and personal property inven-

toried at $13,000.  He left a family of four sons and eight daughters, all of whom were adults at the time of the execution of the will, and most of them had families of their own.  The testator was a man of little education, who read print with difficulty, and could barely write his name, but was a practical, hard-working farmer, in good health up to the last two years of his life.  In his earlier years he had been a drinking man, and about fifteen or twenty years before his death his team ran away with him, injuring his left eye, since which time he had not used much liquor.  About two years before his death he had caught cold in his injured eye, and inflammation had set in, and it had caused him considerable pain up to the time of his death.  The children were all industrious, and worked on the farm in their earlier years.  The elder boys, William and James, with their father's aid had purchased farms in the vicinity and moved on to same.  All of the girls except *Georgiana* married neighboring farmers, and lived in the vicinity, except *Agnes McIntyre*, who moved to Iowa.  For some years prior to 1895 the sons *Andrew* and John worked the homestead farm together and operated a threshing outfit, the father and mother and *Georgiana* living with them.  In 1895 trouble arose between *Andrew* and John concerning the division of profits in the threshing business, and *Andrew* left home and bought a farm of his own.  John, however, continued to work the home farm; but the disagreement above mentioned continued to grow, and involved the other members of the family, until the ill feeling became acute.  The sons John, James, and William were upon one side of this difficulty, and *Andrew* and the girls upon the other.  The mother took sides with the latter faction, and for about a year before her death John, James, and William did not visit her, she having requested them to remain away from the house.  The testator, however, visited at his sons' residences and became reconciled with John.  When John left the home farm, his tenancy

was suceeded by that of William Russell, a son-in-law who had married the daughter *Jane;* and the family then consisted of Mr. Butler, the testator, his wife, his daughter *Georgiana*, his daughter *Jane*, and her husband. After this change the relations between the old gentleman and the rest of his family at the home farm were no more pleasant than before. Mrs. Butler, who was a year older than her husband, became sick in November, 1899, and died December 26, 1899. The relation between the testator and his wife were not very cordial, and he expressed little solicitude for her in her last illness, and was not much affected by her death. After her death the son *Andrew* paid his mother's funeral expenses, and the testator did not like it. January 5, 1900, *Andrew* made a petition for the appointment of a guardian over his father, and caused notice of the application for the appointment of a guardian to be served upon him by an officer. On the day that he received the notice he took it to his sons William and James to find out what it meant, and they, at his request, took it to *Mr. Templeton*, the executor, to advise with him about it. They also consulted an attorney as to the effect of the proceedings upon their father's power to make deeds and sell his property. The proposal to appoint a guardian seems to have angered the old gentleman, and the family feud increased thereby. On January 22, 1900, the son William and the testator went to *Templeton's* house, in the village of Templeton, a distance of four or five miles; the son driving him over with a horse and buggy. On arriving at Templeton the testator asked *Templeton* if he could draw a will, and *Templeton* said he could; and they had a conversation of an hour and a half, during which the testator and *Templeton* were entirely alone. The testator had with him a list of his children, upon which *Mr. Templeton* noted opposite each name what property the testator wished each child to have. *Templeton* started to draw a will, but, concluding that he had not sufficient data to correctly de-

scribe the real estate, he made a memorandum of Mr. But-
ler's wishes; and the testator went home, with the under-
standing that *Templeton* would complete the will as soon as
possible, and send for the testator to have it executed. At
this interview Mr. Butler informed *Templeton* that he de-
sired Henry T. Jeffery and John A. Rogers to act as wit-
nesses to his will, and he requested *Templeton* to send word
to his son William when the will was ready for execution.
On the same day *Templeton* went to Waukesha with his
memorandum, and went directly to the register of deeds' office,
and procured William Swan, deputy register of deeds, to assist
him in perfecting the descriptions of real estate and draw-
ing the instrument. The will was written, except the attes-
tation clause, and *Templeton* took it back home, with the
understanding that Swan would come out when sent for to
see it signed. *Templeton* sent word by letter to the son
William to meet at his house January 24th and execute the
will. Those present that day were *James Templeton*, John
A. Rogers, Henry T. Jeffery, William E. Swan, Andrew
Templeton, William Butler, the testator, and his son William
Butler, Jr., the latter of whom drove his father over in a
buggy. *Mr. Templeton* informed Mr. Butler that the will
was ready, and William Butler, Jr., and Andrew Templeton
withdrew to the kitchen. *James Templeton*, William Swan,
and the testator went into the parlor and closed the doors.
The will was read over paragraph by paragraph to Mr.
Butler, and he seemed to comprehend it, and suggested no
changes. When they came out of the parlor, William Swan
asked the testator if he could sign his name, and he said,
"No;" but he said to the witnesses that this was his will,
and requested them to sign it, and that he was not influenced
in making it by any one. He signed the will by mark, Mr.
Swan holding the pen. The will being executed, the party
dispersed, and the will remained in the possession of *Mr.
Templeton* until offered for probate. February 7, 1900, he

In re Butler's Will.

left his homestead, and went to the home of his sons John and James, where he died February 25, 1900. He had been gradually failing in health for some time, but was able to walk about up to the time when he left his homestead. A large amount of nonexpert evidence was introduced as to his capacity to make a will. By the will he left thirty-nine acres of land to his son James, seventy-seven and one-half acres to his son John, thirty acres to his son William, $50 each to his daughters *Sarah J. Russell, Georgiana Butler, Margaret G. Jeffery*, and *Jane E. Russell*, and $50 to his son *Andrew L. Butler.* To his daughter *Georgiana*, in addition, he gave two and one-half acres of land in the village of Sussex. The balance of his personal estate he gave to his daughters *Marion L. Booth, Agnes McIntyre*, Elizabeth M. Howard, and Harriet P. Craven, in equal shares. The will was contested by seven of the children; William Butler, James D. Butler, John A. Butler, Elizabeth Howard, and Harriet P. Craven not joining in the contest.

For the appellant there was a brief by *Tullar & Lockney*, and oral argument by *D. S. Tullar* and *Henry Lockney*.

For the respondents there was a brief by *Ryan & Merton*, and oral argument by *T. E. Ryan*.

WINSLOW, J. A preliminary objection is made by the respondents that the executor is not aggrieved by the judgment refusing to probate the will, and hence cannot appeal. The principles stated in the case of *In re Luscombe's Will*, 109 Wis. 186, are decisive against this contention. In that case the appellant was a testamentary trustee who appealed from a judgment cutting off the rights of unborn *cestuis que trustent*, and it was held that the trustee was both entitled and bound to protect their possible rights by appealing. Here the appellant is an executor who has qualified and entered upon the duties of his trust. While so acting a judgment is entered putting an end to his trust and to the right

of the beneficiaries thereunder. It seems very clear that it is the duty of the executor to protect and enforce his trust, and to take all such steps as in the exercise of sound judgment seem reasonably necessary for that purpose against persons who are seeking to destroy the trust. Any other course would constitute a dereliction of duty. *Hesterberg v. Clark*, 166 Ill. 241. Were the contest simply one between two beneficiaries, *sui juris*, to settle their respective rights under the terms of the trust, the question would be different, and it might perhaps be said that the trustee would not be aggrieved by a judgment determining their rights, because the trust itself is not attacked, but simply interpreted; but, where a judgment effectually destroys the trust, there would seem to be no doubt of the fact that the trustee, in his official capacity, is aggrieved thereby, and that it is his duty to vindicate his trust by taking such legal steps for that purpose as in the exercise of good faith seem reasonably necessary.

Passing to the merits of the case, we are confronted with a large mass of testimony upon which are founded the conclusions of the trial court that the testator had not testamentary capacity and made his will under undue influence. We have patiently and carefully read this testimony, and have reached the clear conclusion that neither finding is justified by the evidence. There is really no tangible fact in the evidence which shows that the testator lacked testamentary capacity. It is true that the contestants all testified, in general terms, that in their judgment their father was incapable of doing business or making a will, and it is also true that a number of disinterested witnesses testify to the same effect; but it cannot fairly be said that any witness testifies to a single solid, convincing fact which justifies such a conclusion. Nonexperts may give their opinions as to the soundness of a person's mind, when they have first shown such personal intercourse with the person in question as satisfies the court of their ability to give an intelli-

In re Butler's Will.

gent. opinion. *Crawford v. Christian*, 102 Wis. 51; *In re Welch*, 108 Wis. 387. If, however, the acts and conversation of the supposed incompetent person, when detailed by the witness, show merely mental eccentricities, as distinguished from weakness of mind or delusions affecting testamentary capacity, it is very evident that the opinion of the witness that the person in question is or was incapable of making a will must have very little probative force. Testing the evidence before us by these principles, we can give very little weight to the opinions of the witnesses to the effect that William Butler did not have testamentary capacity when he executed the will in question. That he was an old man of irascible and violent temper is sufficiently shown. That his eye pained him greatly at times, increasing his irascibility, is certain. That the unfortunate family troubles which surrounded his later years made him frequently suspicious and violent is also certain. That he did not reason with entire justice to his children or his wife who were engaged in this controversy may be admitted. But all these things do not show incapacity to make a will. The actions which were relied upon by the witnesses to show incapacity were, principally, that he was changeable in his conversation; that he would get up nights, and wake up the family, and say somebody was around; that he sometimes took a stick and hammered on the fence; that he watched the actions of members of the family, sometimes dodging behind trees; that he showed no adequate concern at his wife's illness, saying that he was as sick as she was; that he threatened suicide; and that some days he acted kindly to his wife, and sometimes would not speak to her.

All of these eccentricities are easily explainable, and have little weight as tending to prove unsoundness of mind, when the terrible pain of the injured eye is considered, which frequently kept him awake nights, and when we also consider the discord in the family, in which all were involved, and

In re Butler's Will.

which proceeded to such lengths that the mother refused to see the sons.

There is practically an entire lack of evidence that the testator had any difficulty in remembering what his property consisted of, or where it was or what it was worth, or that he had any difficulty in remembering his relations to his children. On the contrary, there was very satisfactory evidence that two weeks before his death, while he was at James Butler's house, he talked freely of his property, and stated in detail all the property that he had on his home farm, enumerating the stock and grain, tools and vehicles, and placing values thereon which were all substantially accurate and correct. The evidence, also, that he had an accurate knowledge of his property, and communicated it to *Mr. Templeton* (a disinterested party) when he went to have his will drawn, is entirely satisfactory. The test is not whether the testator did the best or the wisest or the theoretically just thing in his will; but, Did he have sufficient active memory to collect in his mind and comprehend, without prompting, the condition of his property, his relations to his children and other persons who might properly be his beneficiaries, and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other, and be able to form some rational judgment in relation to them? *In re Lewis's Will*, 51 Wis. 101.

Applying this test to the present case, it may be said without hesitation that there is no tangible evidence in the case which throws even serious doubt upon the testator's ability to do all of these things at the time he executed his will.

Passing to the question of undue influence, there is even less testimony in support of this contention than in support of the contention of lack of capacity. It is clear that the testator was greatly embittered against those members of his family who justified the commencement of guardianship .

In re Butler's Will.

proceedings, and that he made the will while feeling this bitterness; but he had not been under the influence of the parties who are benefited by the will, but, on the contrary, had been living with the Russells, who belonged to the other faction, up to the very time the directions for drawing the will were given to *Mr. Templeton*. The situation had not arisen when a presumption of undue influence arises, and, even if it had, still the clear and undisputed testimony of *Mr. Templeton*, showing the testator's independent action in the dictating of the terms of the will, in connection with the other facts in evidence showing that the will was the result of the testator's own determination, would be entirely sufficient to overcome the presumption.

Pages might be filled with detailed statements of the testimony of the various witnesses in this case, but it is not deemed either necessary or justifiable. It is sufficient to say that the entire testimony shows, without serious doubt, that the testator was entirely competent to make a will, and that his free agency was not destroyed or impaired by the influence of others, and hence that the decree of the county court admitting the will to probate should have been affirmed.

*By the Court.*— Judgment reversed, and action remanded to the circuit court with directions to affirm the judgment of the county court of Waukesha county.

On May 21, 1901, a motion by respondents to amend the judgment so as to direct costs of both parties to be paid out of the estate was denied.