WILL OF LUNDQUIST: LUNDQUIST, Appellant, vs. HANSON and others, Respondents.

*October 13—November 10, 1931.*

For the appellant there was a brief by *Dean & Dean* of Glenwood City, attorneys, and a separate brief by *Henry A. Huber* of Stoughton and *Fred L. Holmes* of Madison of counsel, and oral argument by *Mr. Huber, Mr. Holmes,* and *Mr. H. H. Dean.*

For the respondents there was a brief by *Spencer Haven,* attorney for the Children's Home, *William B. Webster,* attorney for proponent Charles Hanson, and *C. A. Cross,* guardian *ad litem* for Betty Hanson, all of Hudson, and oral argument by *Mr. Webster* and *Mr. Haven.*

NELSON, J. Alma Lundquist, aged about seventy years, died on the 17th day of July, 1930, leaving a last will and testament which, after contest, was admitted to probate. Deceased left her surviving as her sole heir at law her hus-

band, Ludwig Lundquist, contestant and appellant herein. Her estate, at the time of her death, consisted of a house and about two and a half acres of land, a mortgage for approximately $6,000, and certificates of deposit aggregating the sum of about $5,000.

Her will, which was executed on the 15th day of April, 1930, omitting the first paragraph, which provided for the payment of her debts, etc., and the final paragraph, which nominated an executor, is as follows:

"Second. I give, bequeath, and devise to my husband, Ludwig Lundquist, the twenty-acre farm known as my residence (situated in the city of Glenwood, St. Croix county, Wis.); also all personal property that belongs to me located on said twenty acres farm to [do] I give, devise, and bequeath to my husband at the time of my death.

"Third. From the remainder of my estate, I give, devise, and bequeath to Miss Betty Hanson, daughter of Chas. Hanson of the town of Springfield, the sum of $1,500.

"Fourth. The balance of my estate both Real & Personal I give, devise, and bequeath to the Children's Home of the Illinois Conference of the Swedish Evangelical Mission Covenant of America at Princeton, Illinois."

Probate of the will was contested on three grounds:

(1) That it was procured by the exercise of undue influence.

(2) That the deceased, at the time of the execution of the instrument, was of unsound mind and not in possession of sufficient mental capacity to make a will.

(3) That the deceased, at the time of executing the instrument and for many years prior thereto, was obsessed with insane delusions and that the making of said alleged will was governed, controlled, and influenced by said delusions, and that said alleged will is the product of said delusions, among which was the delusion entertained by her that the brothers of her husband coveted her property, de-

sired her to make a will in their favor, and that if she should will her property to her husband or permit it to go to him by force of law on her demise, his said brothers would in some manner get the property away from him even though he were given only the life estate or use therein.

Alma Lundquist intermarried with the appellant in 1896. At the time of her marriage she had no property. The deceased was, at that time, an epileptic. She continued until her death to be a typical epileptic, subject to continually recurring fits, although appellant did everything within his power to furnish her medical care and treatment in the hope that she might be cured. She was nervous, forgetful, and ailing during much of her married life. She attributed her condition to the asserted facts that her grandfather was "awfully nervous" and that as a child she had suffered from an attack of "brain fever" which left her weak and weak-minded. She had never had her menses and was incapable of bearing children. She had a growth on the back of her neck which from time to time changed in size and appearance in re-curring cycles of enlargement and subsidence. During the latter years of her life her disease had so progressed and her mental and physical condition was such that she did but very little of the everyday housework. During the last six or eight years of her life appellant himself performed nearly all of the housework, such as washing the clothes, scrubbing the floors, preparing and serving the meals. She concededly had a number of well defined delusions of which she talked at different times and at different places to her neighbors and friends who came in intimate contact with her. These were based upon hallucinations. She saw things that did not exist, occurrences that did not happen, falsely believed in states of facts that did not exist, and she could not be per-suaded of the falsity of her imaginings. For many years prior to her death she had a well defined delusion based upon

an hallucination that she was pursued by a man with a butcher knife. Sometimes the man with the butcher knife, she asserted, came after her from the cellar, at other times from upstairs. On one occasion he was standing on the porch of her nephew's home trying to get into the house. After decedent had broken her arm in May, 1927, in an attempt to escape from this man, she told her sister-in-law of the incident. On another occasion she told her of "the whole North Sea coming into her house which required her to climb up on a couch in order to escape getting wet." She was obsessed with the notion that she had seen a coffin right in front of her on the floor of her home and she had tried to run away from it and had fallen. She reported that she had seen funeral processions come into her yard; that she visioned dead people; that for many years an apparition, which she thought was God, consistently followed her because, as she averred, she had dishonestly retained too much change that a certain merchant had mistakenly given her at a time when she purchased a dress. She also had hallucinations as to imaginary men fighting. She appeared to see them on several occasions. At different times she claimed that the pictures on the wall moved; that a picture of the Christ dropped blood; that her mother had appeared to her and had confessed that she had not done the right thing while living. Deceased sometimes talked to herself and seemed to engage in conversations with unseen persons when she was alone. She gave expression to the notion that her neighbors were bad neighbors and bothered her by hanging around her home at night and by ordering her and her husband to move from their home. At another time she told of a black face which peered at her through the windows.

The record further reveals that, for many years, she harbored feelings of hatred for appellant's two brothers who resided in Chicago, both of whom had had almost no per-

sonal contact with the deceased or appellant during their married life. To a considerable number of the witnesses she expressed her dislike of these brothers, to others she expressed the same hatred coupled with the assertion that they would never get any of her property and never should have any of appellant's property. To some she asserted as a fact, contrary to all reasonable probabilities and to all positive testimony on the subject, that the brothers of her husband had requested and desired that she make a will in their favor. To several she expressed the fear that if she left her property to her husband his brothers would coax it away from him or in some manner get it away from him. She could not be convinced that if she left her property to her husband for life with remainder over to the Children's Home, the Children's Home would ultimately get it. She was obsessed with the idea that if she left her property even to her husband for life his brothers would get it in some manner. The length to which her unreasonable hatred moved her is illustrated by the following incident: In 1928 one of the brothers sent a Christmas package to them. Deceased would not permit her husband to bring it into the house, but compelled him to return it unopened to the sender.

It was the consensus of opinion held by those who knew her well and who were in a position to give positive testimony as to her characteristics, ailments, hallucinations, delusions, and obsessions that she was "not right in the head." The testimony of the husband bearing upon her mental state was excluded. Two eminent specialists, Dr. William H. Hengstler and Dr. George Ruhberg, both of whom were unquestionably qualified to give opinions as to the mental condition of the deceased, were present throughout the trial. Both testified that in their opinion the deceased was insane, was dominated and influenced by her well

defined delusions. Both doctors admitted that she may have had, and probably did have, testamentary capacity at the time she executed the alleged instrument, as testamentary capacity is defined by the decisions of this court; that is to say, "sufficient mental capacity to comprehend the condition of her property, her relations to the persons who were or who might have been the objects of her bounty, and the scope and bearing of the provisions of her will." *Estate of Weaver,* 191 Wis. 431, 211 N. W. 130. Dr. Arthur E. McMahon, a local general practitioner, expressed the same conclusions as the specialists. No medical testimony was offered by proponent.

Appellant at the time of his marriage was the owner of a farm which he was then operating. After a number of years this farm was sold. For a number of years thereafter he and deceased lived on rented farms and after several years another farm was purchased, title to which was taken in the name of deceased. Some considerable time before the death of deceased the latter farm was sold and a twenty-acre tract was purchased, title to which was also put in her name. During their married life the profits of their husbandry were divided equally, each maintaining his share in his own name, evidenced by mortgages or certificates of deposit. The evidence overwhelmingly shows that appellant was always good to the deceased, provided medical care and treatment for her at his own expense, largely relieved her of the household duties, even to the doing of the washing, scrubbing, and the preparation of the meals. No witness pretended to testify to any expression by the deceased which evinced any anger or ill will toward her husband. For many years prior to her death the appellant faithfully accompanied her wherever she went. He, in fact, was present at the bank when the instrument in question was executed.

The case made out by the contestants presents a picture of a woman who was diseased, a sufferer from epilepsy, peculiar, abnormal, nervous, forgetful, subject to hallucinations which had become fixed delusions and obsessions— a woman who was in fact insane.

The proponent produced numerous witnesses who had only had very casual contacts with the deceased and who knew nothing of her epileptic condition, of her hallucinations, marked peculiarities or delusions. To a number of banks she went with her husband once or twice a year and had her certificates of deposit renewed. The contact with the bank officers was brief and for the purpose of renewing certificates of deposit. The circuit judge and the clerk of court testified to her having been a witness in a foreclosure proceeding in which she was interested, a few months before she died. The county judge of St. Croix county also testified to two interviews which he had had with deceased not so very long before her death. There was also testimony given by several relatives who occasionally visited her, to the effect that she appeared to be all right and of sound mind on such occasions. A reading of all the testimony produced by the proponent justifies the conclusion that it was largely negative in character and was not such as should have overcome the positive testimony of the numerous witnesses as to the delusions and obsessions, and the testimony of the medical experts. We do not think the trial court fully appreciated the very narrow question which required determination. The court in its decision said:

"In arriving at the conclusion that testatrix was possessed of testamentary capacity, I am giving due consideration to the expert testimony. I believe that the testatrix was insane, that is, that the insane hallucinations amounted to insanity, but her insanity was not such that it deprived her

of these elements of thought essential in the making of a will."

The court in its decision also said:

"The husband accompanied the wife, was present when the propounded will was made, silently acquiesced in the certification as to her soundness of mind, and it does not seem fair to the testatrix that he should now attempt to thwart her wishes when her lips are closed."

The fifth finding of fact is as follows:

"That the testatrix, at the time of the execution of said will, had capacity to make her will; that she understood the nature of her act; that she comprehended perfectly the condition of her property and her relations to those who might expect to become the objects of her bounty, and was able to collect and hold those elements in her mind without prompting."

It seems very clear from a reading of both the decision of the trial court and its findings of fact that the court gave undue importance to the question of testamentary capacity.

It is clear from the language of the trial court that in weighing the testimony as to the delusions, and in weighing the testimony of the experts, it did not give such testimony the consideration to which it was entitled, due apparently to its belief that if the deceased had testamentary capacity at the time of executing the instrument, notwithstanding her insanity, that was sufficient.

The important question upon the trial of this contest was not alone whether the deceased had, at the time of executing the instrument, testamentary capacity as defined by law, but whether such testamentary capacity was affected by any of her delusions.

The controlling issue in this case is whether the delusions and obsessions of the deceased materially influenced the provisions of her will or, as it may be otherwise ex-

pressed, materially affected her will as made. *Will of Cole,* 49 Wis. 179, 5 N. W. 346; *Will of Shanks,* 172 Wis. 621, 179 N. W. 747; *Will of Behm,* 187 Wis. 10, 203 N. W. 718.

Many persons may labor under insane delusions and yet be competent as having testamentary capacity to make a will. *Will of Cole, supra; Will of Shanks, supra.* "The holding of delusions does not in and of itself constitute testamentary incapacity. There may co-exist delusion and disposing mind. A delusion affects testamentary capacity only when it enters into or controls in some degree its exercise." *Matter of Heaton,* 224 N. Y. 22, 120 N. E. 83, citing *Dobie v. Armstrong,* 160 N. Y. 584, 55 N. E. 302; *Middleditch v. Williams,* 45 N. J. Eq. 726, 17 Atl. 826; *Shreiner v. Shreiner,* 178 Pa. St. 57, 35 Atl. 974. In *Will of Shanks, supra,* it was said, in reference to the alleged will discussed therein: "In other words, is it reasonably certain that but for the insane delusion his wife would have received a materially larger devise. If that is reasonably certain, then mental incapacity is sufficiently shown to invalidate the will made." To the same effect are *Will of Behm, supra,* and *Estate of Knutson,* 201 Wis. 526, 230 N. W. 617.

When all of the facts and circumstances are considered, this will is not only unnatural but decidedly unjust. Its very provisions, when considered in connection with the undisputed facts, namely, that her husband was her only heir at law; that for over thirty years he had cared for her and treated her kindly; that she bore him no ill will and that she left no property except that which he had given her or which had been added thereto as a result of their joint labors, give rise to questions and doubts. One naturally asks, why? The record reveals the answer. She was insane and her obsessions and delusions relative to her hus-

band's brothers controlled and influenced her in the making of her will.

There is nothing in the record which reasonably justifies her hatred of her husband's brothers; nothing to show that her obsessions as to them had any basis in fact; nothing on which to base her judgment that they coveted her property, desired her to make a will in their favor, or that they would get it away from her husband in case she left it to him outright; nothing, of course, to show that they would get it away from him in some manner even if she left him only a life estate therein. All of these delusions which so strongly obsessed her were the offspring of a mind diseased. She was concededly insane, due to a disease from which she had suffered throughout the greater portion of her life. The undisputed fact of her insanity makes it impossible for us to see in her attitude toward her husband's brothers and her beliefs in regard to them, anything but insane delusions.

We entertain no doubt that the delusions of the deceased relating to her husband's brothers materially influenced her alleged will and that it would have been quite different but for the delusions. We conclude that the finding of the court to the contrary is against the great weight and clear preponderance of the evidence.

For the reasons stated the judgment of the county court of St. Croix county admitting the will of Alma Lundquist to probate must be reversed.

*By the Court.*—Judgment reversed.