WILL OF WASHBURN: WASHBURN, Appellant, vs. WASHBURN, Respondent.

*March 12—April 12, 1946.*

468

For the appellant there was a brief by *Edward G. Minor* of Sturgeon Bay and *E. L. Everson* of Green Bay, and oral argument by *Mr. Minor*.

For the respondent there was a brief by *H. M. Ferguson* and *H. Jay Leasum,* both of Sturgeon Bay, and oral argument by *Mr. Ferguson*.

BARLOW, J.   The only question involved on this appeal is whether the judgment of the county court that the testator had mental capacity to execute a will was against the great weight and clear preponderance of the evidence.

George H. Washburn was born in Sturgeon Bay and lived there all of his life.   He was employed in his father's store for many years prior to 1932, when the store was sold, and continued to work for the new owners until April, 1938.  He died May 3, 1944, at the age of sixty-seven years, and left surviving, as heirs and legatees, his widow, Lilyan Washburn, aged forty-nine years, his third wife, whom he married May 20, 1936; Genevieve Walker, a daughter, married and living in Brazil,

South America, who had not visited her father for six years, although she had visited in this country three times during that period, aged forty years; Jane Lewis, a daughter, married and living in Michigan, who had not visited her father's home since 1939, aged thirty-one years; Lawrence H. Washburn, a son, married and living in Milwaukee, and on friendly terms with his father, having a good job and a substantial income, aged twenty-five years.

Testator inherited all of the property which he owned from his father. By the will executed November 30, 1942, he gave $500 to his daughter Genevieve Walker, $500 to his daughter Jane Lewis, $1,000 to his son Lawrence Washburn, and the rest, residue, and remainder of the estate to his wife, Lilyan Washburn, if she survived him. Provision was made in the will that in the event of the death of the wife prior to his death, the residue of the estate was to go to Lawrence Washburn, and in the event of the death of any of his children prior to his death the share of such deceased child was to go to his wife, Lilyan, in the event she survived him, or to his son Lawrence in the event of testator's wife's death prior to his death.

In August, 1942, testator suffered a heart attack at Escanaba, Michigan, while returning from an automobile trip, and was confined to bed for three days, returning then to Sturgeon Bay. In October, 1942, he suffered a coronary attack and was confined in a hospital in Sturgeon Bay for ten days, leaving the hospital on the 24th day of October, 1942. The doctors who cared for him while he was in the hospital diagnosed his condition as being a general arteriosclerotic vascular disease that had affected his brain, heart, and circulation. The two doctors who cared for him testified that he was unable to carry on an intelligent conversation during that time, could not remember things that had occurred two or three hours previously, and testimony was introduced to the effect that he would not stay in bed but would walk around the corridors without ample clothing, and could not remember dates and names of persons.

After leaving the hospital he made several trips there on the pretense of seeing persons who were not there and had not been there for some time.

Lay witnesses testified that he could not seem to think of what he wanted to say, talked slowly, stumbled over things, and never remembered what he wanted to talk about. He had difficulty in remembering dates and names and had a "flight of ideas."

The two doctors who cared for him while he was in the hospital in October, 1942, testified, in answer to a hypothetical question covering the foregoing facts in general, that testator was not a mentally normal individual on November 30, 1942, the date on which the will was executed, and that in their opinion at that time he did not have sufficient mental capacity to know and remember the nature, extent, and condition of his property and the identity and character of his natural heirs and beneficiaries so as to make an intelligent disposition of his property.

On November 9, 1943, nearly a year after the will was executed, a guardian was appointed for the testator by the county court of Door county. Testator testified as a witness at the hearing and was agreeable to the appointment of a guardian. Just prior to his death on May 3, 1944, he was sent to the state hospital for the insane at Winnebago, and returned to Sturgeon Bay where he died a few days later.

Witnesses on behalf of the proponent of the will consisted of several persons who were roomers in the Washburn home at the time the will was executed, and neighbors and friends of long acquaintance. The roomers testified that they talked with him frequently after he returned from the hospital; that he appeared to be perfectly normal; talked with them about his children—knew their names and where they were living; discussed his property and the possibility of building a cottage; discussed politics and general subjects of interest; and they stated that in their opinion he was a normal individual during the period shortly before and after the will was executed.

Neighbors and close friends testified that they had known him for many years and visited with him frequently, either at their homes or at his home; that he appeared to be normal, and they noticed no change over a period of years; that he was a gracious host; discussed his property and his family and the possibility of selling the large home he lived in and building a smaller home, and showed a keen interest in the progress and success of his son, and likewise an interest in his daughters. He discussed with two of his close friends the fact that he intended to make a will, prior to making it, and informed them he had made a will after the will was executed. Most of the witnesses admitted that in the late spring of 1943 they noticed a change indicating a poorer state of health and mental condition, which was not noticeable prior to that time.

Dr. Millard Tufts, a practicing physician in Milwaukee, Wisconsin, who had known testator for forty years, and who was the physician testator usually consulted, testified that testator consulted him once in January, 1942, four times in August, 1942, and again in October and December, 1942. This is the physician he consulted after the heart attack at Escanaba, Michigan, which resulted in his hospitalization in Sturgeon Bay. He testified there was no change in testator's mental condition prior to December, 1942; that he would know his relatives and he saw no reason why he should not know the nature and extent of his property, although he did not make any particular test of his mental capacity. There was no question in his mind about the mental capacity of testator at the times he examined him, and nothing unusual occurred at the times he saw him to raise any question in his mind. He testified that on March 24, 1943, when he examined him, his heart condition was improved.

The will was drafted by H. M. Ferguson, a former county judge of Door county, and a reputable lawyer, who had practiced law in Sturgeon Bay for thirty-one years and had known testator for thirty years. Testator first talked to him at his office about making a will, and shortly afterwards mentioned

it when he saw him on the street. A few days later Ferguson called testator, informing him he would call at his home that evening to draft his will, which he did. Testator and the attorney who drafted the will had freely discussed all of the terms of the will, and testator told him about the members of his family, their situation in life, mentioning that his son was employed in a defense plant in Milwaukee, earning a good income and able to take care of himself, and said his daughters were both well married and comfortably situated. The attorney knew that testator had had some kind of coronary attack while on an automobile trip in Michigan, but had not heard that it affected him mentally, and said that the appearance and actions of the testator seemed perfectly normal.

The other witness to the will was a banker in Sturgeon Bay, who had known testator for at least forty years and had noted nothing strange about the actions or conduct of testator until the following year. There was testimony that testator conducted his general business at all times prior to the execution of the will and for some time thereafter.

Appellant contends that the testimony of numerous witnesses as to delusions and obsessions and the testimony of the medical experts is sufficient to sustain the burden of proof requiring them to establish by a clear preponderance of evidence that the testator was mentally incompetent to execute a will at the time the will was executed, relying especially on the rule that the testimony of medical experts and general physicians is of far greater importance and weight than that of nonexpert witnesses, citing *Estate of Bean* (1914), 159 Wis. 67, 71, 149 N. W. 745; *Will of Lundquist* (1931), 205 Wis. 667, 673, 238 N. W. 861; Page, Wills, sec. 783; Schouler, Wills, sec. 239. Appellant contends that the testimony of proponents is largely from lay witnesses, and in general is negative and therefore is not sufficient to overcome the medical testimony in the case.

In examining the medical testimony, there is no evidence to show that the doctors who testified for contestant were the

regular family physicians of the testator or that they had any knowledge of his general condition except during the time he was in the hospital. When the testator was admitted to the hospital he had very high blood pressure—198 over 210. It is not difficult to understand that he had "flights of ideas," as was testified to, during that period. There is evidence to indicate that this condition improved, and that it was improved after he left the hospital. Dr. Dorchester, one of contestant's witnesses, testified that it has been characteristic of the affliction from which testator was suffering that a patient can be normal part of the time and then be completely disconnected at other times, and that this condition is generally progressive, although it may remain apparently normal for a time.

The learned trial judge, in a memorandum filed at the time of admitting the will to probate, said:

"The witnesses on both sides were people of integrity and testified as to actual conditions as they saw them, and I do not question that they truly described George Washburn's condition as it was when they observed him."

This is wholly consistent with the medical testimony as to the characteristics of the ailment from which testator was suffering.

The will was a natural will, having in mind the degree of relationship, health, and financial status of the beneficiaries. The daughters were well married and in comfortable circumstances, and the son was earning a substantial income. His wife was not in good health and had no individual property except a joint interest in the home, which was held in joint tenancy, and residual beneficiary in three refund annuity policies, all of which was provided for her by testator after their marriage.

The testimony of the attorney who drew the will and was one of the subscribing witnesses may not be lightly brushed aside or permitted to be outweighed by circumstances which

give rise merely to suspicion. *Will of Grosse* (1932), 208 Wis. 473, 480, 243 N. W. 465; *Will of Schaefer* (1932), 207 Wis. 404, 414, 241 N. W. 382; *Estate of Scherrer* (1943), 242 Wis. 211, 214, 7 N. W. (2d) 848. The test of mental capacity, as laid down in *Will of Butler* (1901), 110 Wis. 70, 78, 85 N. W. 678, is as follows:

"The test is not whether the testator did the best or the wisest or the theoretically just thing in his will; but, Did he have sufficient active memory to collect in his mind and comprehend, without prompting, the condition of his property, his relations to his children and other persons who might properly be his beneficiaries, and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other, and be able to form some rational judgment in relation to them?"

It was said in *Will of Grosse* (1932), 208 Wis. 473, 480, 243 N. W. 465, quoting from *Aggas v. Munnell,* 302 Pa. St. 78, 152 Atl. 840, 843:

"Neither old age nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property."

It is considered that the judgment of the county court finding testator mentally competent to make a will at the time the will was executed is not against the great weight and clear preponderance of the evidence in the light of the testimony of a doctor who had known testator for forty years and occupied a position which was at least equivalent to being the family physician, and the positive testimony of the attorney who drafted the will, together with all of the evidence in the case.

*By the Court.*—Judgment affirmed.

RECTOR, J., took no part.