WILL OF DELMADY: PATRYKUS and wife, Appellants, vs. TRACY, Respondent.

*June 10—July 1, 1947.*

For the appellants there was a brief by *Michael J. Dunn* of Stevens Point, and *Brazeau & Graves* of Wisconsin Rapids, and oral argument by *Mr. Dunn* and *Mr. Theo. W. Brazeau.*

For the respondent there was a brief by *J. A. Meleski* and *Fisher, Reinholdt & Peickert,* all of Stevens Point, and oral argument by *William E. Fisher.*

FRITZ, J. On their appeal Michael and Matilda Patrykus contend the court erred in finding and concluding that when the instrument of December 27, 1943, was executed by Delmady, he—

"did not possess sufficient active memory to be able to collect and comprehend, without prompting, the condition of his

property, his relations to those persons who might properly be his beneficiaries and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other and be able to form a rational judgment in relation to them;"

and that the court erred also in finding that,—

"the execution of the will of 1943 was procured by undue influence exercised by Mike and Matilda Patrykus, and therefore that it is not the will of James Delmady."

In passing upon these contentions there are applicable herein the following rules:

(1) that "the relative credibility and weight of the testimony of the witnesses, and the corroborative values of the circumstantial evidence, were primarily for the consideration of the trial court; and its findings are not to be disturbed on an appeal, if there is sufficient credible evidence to sustain them, and no error prejudicial to appellant occurred in ruling on the admission of evidence" (*Graham v. Zellers,* 205 Wis. 542, 544, 238 N. W. 385; *Will of Kintopp,* 250 Wis. 381, 27 N. W. (2d) 481 (Decided May 13, 1947) );

(2) that "undue influence is considered as a species of fraud and must be established by clear, convincing, and satisfactory evidence" (*Will of Schaefer,* 207 Wis. 404, 411, 241 N. W. 382; *Will of Faulks,* 246 Wis. 319, 344, 17 N. W. (2d) 423);

(3) that the test of testamentary competency is whether the testator did "have sufficient active memory to collect in his mind and comprehend, without prompting, the condition of his property, his relations to his children and other persons who might properly be his beneficiaries, and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other, and be able to form some rational judgment in relation to them" (*Will of Butler,* 110 Wis. 70, 78, 85 N. W. 678; *Will of McLeish,* 209 Wis. 417, 420, 245 N. W. 197);

(4) and that the contestant must establish mental incompetency or lack of testamentary capacity of the testator by clear, convincing, and satisfactory proof (*Will of McLeish, supra*).

James Delmady, a bachelor, died February 26, 1944, at the age of about eighty-three years. He had made a will on August 16, 1897, giving his property to his two brothers, Owen Tracy and Charles Brown. There was also a sister, Mary. Under an instrument executed by Delmady as his will on December 27, 1943, Michael Patrykus and his wife Matilda were the sole beneficiaries. Delmady could neither read nor write, nor count currency; and he did not know his age, and was evidently a person of very weak mentality. He had acquired eighty acres of land from his father, who retained a life interest therein until his death many years ago; and on this land there was a shanty and a so-called barn, which were worth about $1,000 at the time of Delmady's death. He did work at the farm and around the neighborhood all of his life; and in addition to his farm he had accumulated at his death $4,067.52 in money, and also other personal property worth about $100. He would not wear stockings, but wrapped his feet in rags. From 1930 to May, 1943, he lived at the near-by home of Merle and Ann Fisher, and while there during one of the first summers he persisted in sleeping in a school bus. Thereafter he had a room in the house. When the Fishers ceased farming and sold their personal property in May, 1943, Delmady went to the home of Michael and Matilda Patrykus and worked there for his room and board until after the following Thanksgiving. Then Delmady returned to his shanty, and stayed there until the middle of December, whereupon complaints began reaching Vilas Waterman,—who was chairman of the adjoining town of Pine Grove and lived a short distance from Delmady's shanty,—about the conditions under which the latter was living. Waterman notified Charles Martin, chairman of the town of Almond, and the two called upon Delmady at his shanty and required him to be moved therefrom. They contacted a neighbor, Lorbecki, but he could not take Delmady to his home. Then they suggested that Delmady go to the Portage County Home,—the poorhouse,—but as he objected

to going there, they contacted Michael and Matilda Patrykus, and arranged for their allowing Delmady to move to their home, which he did willingly; and he remained there until he died there on February 26, 1944.  In the meantime Waterman, as town chairman, instituted proceedings in the county court of Portage county for the appointment of a general guardian for Delmady, and on January 28, 1944, John Burns, a neighbor and friend of Delmady, was appointed as his guardian under an order which was made by County Judge CARPENTER, in which he determined that Delmady was incapable of taking care of himself physically.  But Judge CARPENTER struck out the word "mentally" in the form in common use in guardianship proceedings and did not hold in that order that Delmady was mentally incompetent to have the charge and management of his property and personalty.

On December 27, 1943, at about 9 o'clock a. m., a son of the appellants, Michael and Matilda Patrykus, called at the office of Attorney Buchanan Johnson to have him come to the Patrykus home, and upon arriving there at 9:30 a. m. Johnson found Delmady lying on a cot in the front room of the dwelling and shook hands with him.  Johnson,—a competent and reputable attorney practicing law for over forty years,—testified he had met Delmady at different times and had known him for about twenty years, but not intimately.  Delmady told Johnson he wanted him to draw some papers, and Johnson suggested that Mrs. Patrykus leave the room, which she did and closed the door.  Then Johnson consulted Delmady about the papers he wished to have drawn and concluded that he wanted a will.  He asked Delmady if he had a mother and father living, and if he had been married and had children.  Delmady told Johnson that he was not married and had no children, and that his father and mother had died some years ago.  Johnson also asked Delmady if he had brothers or sisters living, and he said he had two brothers and a sister at one time, but did not know whether they were living or not, and he had not seen

them for over twenty years. Johnson then asked how Delmady wanted to dispose of his property in case he died and he told Johnson he wanted to leave it to Michael Patrykus and his wife; that he had lived as neighbors to them for all the years past and they had always been very good to him, and for this reason he wanted to leave it to them. Johnson asked Delmady who he wanted to name as executor and explained to him the duties of the executor; and Johnson testified Delmady thought for a moment and suggested John Fisher. Johnson also asked Delmady if he belonged to a church and Delmady said yes, but he had not been a very good Catholic; and Johnson asked him whether he wanted to leave anything and how much to the priest, and Delmady said $100 to the priest of the Catholic church over on Highway 51. Johnson then drove back to his office and typed the will from the notes and directions given by Delmady. Johnson asked the banker at Bancroft if Delmady could read or write his name and was told he never had. After typing the will Johnson returned to the Patrykus place and he found Delmady in the room that he had left him in. In the room there were also Leo Jeske and his wife Marion, and Johnson asked them if they would act as witnesses and they said they would. At Johnson's request Michael Patrykus and his wife then left and the door was closed. Johnson then read the will, including the attestation clause, to Delmady, and explained the meaning of each paragraph and asked him if that was the way he wanted it. Delmady said that was the way he wanted it and said it was all right. Johnson then signed Delmady's name to it so that he could see Johnson sign and write the words "his mark" and the names "James" and "Delmady," and he had Delmady touch the pen as he made the cross mark.

On cross-examination Johnson testified, "Jimmie did not volunteer much conversation, if any," and Johnson made no inquiry about how much money he had in the bank or as to what other property he had. Delmady did not talk other than

to answer Johnson's questions; he did not make any statement as to what the character of the property was; and Johnson did not direct any question to Delmady as to the character or the value or amount of the property.

Leo Jeske testified that when he arrived at the Patrykus home on December 27, 1943, Delmady recognized him and asked how he was and called him by his first name and did the same with his wife, and in then visiting with her he asked about where their boy was and how he was doing overseas and "stuff" like that. Delmady told them he did not feel so bad, that he had a little cold on his chest. He was in bed and had two or three pillows under him and he was lying "like on a rocking chair, kind of high up." He told Jeske, "You are a pretty good man to come when I call you," and told him, after Johnson came, that he wanted Jeske as a witness to sign his will. Jeske and his wife were there maybe a half hour and were talking with Delmady during that time. Jeske testified Delmady's conversation sounded "to me one hundred per cent at the time he talked to me and my wife," and Delmady's mind "was just as perfect as the day I met him first;" that Delmady knew what he was doing when he signed the will, and knew what kind of paper he was signing; and that he was satisfied with it; that he was there when Johnson read that portion of the will "about leaving the part to Patrykuses my friends," and that Delmady said, "that is just what I want them to have;" that Johnson told Delmady if things were not the way he wanted them to tell him and he would change them, and Delmady said, "That is O. K. with me. That is the way I want it;" and that in reference to his relatives Delmady said he did not see them for twenty years and he did not know whether they were dead or alive. Jeske testified also, "Jimmie was not a man whom you could easily influence. I say that because he is a pretty tough Irishman."

Rev. Peter Banka, a priest, testified that he saw Delmady around Christmas, 1943, in the home of Patrykus, and he

asked Delmady about his health and about common things. When he came into the room Delmady said, "Hello Father," and recognized him, and Delmady seemed to understand his questions and did not ask him to explain or repeat, and he always answered to the point whatever he asked him. Ben Patrykus, a son of Michael Patrykus, testified that he saw Delmady at the home of his parents real often and saw him over at Fishers and up around his shanty; that he carried on a conversation, the news of the neighborhood, and some current topics; that Delmady's mind was good, and his conversations and his answers were good up to the time he died.

Edward Golla testified he knew Delmady around fifteen years, and in the fall of 1943 he talked with Delmady on various subjects and always understood him when he talked with him; that he saw Delmady around Christmas, 1943, when he was in bed at the Patrykus home, and Delmady knew him and he said that Delmady's mind was pretty good at the time he saw him after Christmas; that his memory was all right because he talked all right, and he thought his mind was all right because "he looked all right and talked."

On the other hand, Ann Fisher, with whose family Delmady had lived from 1930 until 1943, testified that he was not competent in business matters and was not able to protect his own interests, and his memory and ability were very much on the decline in the later years and he could not take care of his own affairs; that he lacked initiative, and his dealings were meek, backward, and stupid, and it was necessary for his friends to assist him in business matters; that he was never bright but his incompetency grew as he grew older, and he lacked courage to protect himself in business matters and could not and did not keep track of the amount of money he had, although money was his principal asset; and that he would insist on sleeping in the school bus in the shed unless she made him stay in the house.

Vilas Waterman testified that he had known Delmady a long time and he became both physically and mentally weaker

as he grew older; that he had no initiative in and could not comprehend his business matters, and needed assistance in practically all such matters, and he was not in condition to look after them; that such condition grew on him as he grew older, and at the time he went back to the Patrykus place to stay he was not capable of doing business physically or mentally; that he knew he could not comprehend his business; that when a man was as old as Delmady and lived under the conditions in which he was living in the shanty, he was not competent mentally to take care of his own physical welfare—to arrange for being properly cared for physically; and that he had known Delmady for over twenty years last past and in his opinion he was not only incompetent to look after his physical welfare, but was incompetent to comprehend or transact business. Delmady, in testifying at the guardianship hearing, estimated the amount of his money in the bank at less than one third of the actual amount thereof. John Burns, who was Delmady's friend and choice as his guardian when the court appointed him as such, testified that when he called on Delmady to find out about the deed and abstract to his land and Delmady said he had a will at the Bancroft bank, he also said, "You will find that will in the box at Bancroft;" but in this conversation Delmady did not mention to Burns the fact that he had executed the will of December 27, 1943. When Ann Fisher, Vilas Waterman, and John Burns were asked to give an opinion based upon their own acquaintanceship and knowledge of Delmady and his mental qualities or deficiencies, and whether Delmady's mentality equaled the requirements set up in the question, each of the witnesses testified that Delmady did not have the required mental capacity, and each testified to instances which tended to support their opinion. Each of them was evidently an intelligent layman and had had long acquaintanceship with Delmady and many opportunities to observe his mentality.

With the hereinbefore-stated principles of law in mind, careful consideration of the proof to the effect stated above, in connection with the other evidence in the record, compels the conclusions (1) that there was insufficient proof to establish by clear, convincing, and satisfactory evidence that Delmady's execution of the instrument dated December 27, 1943, was procured by undue influence exercised by the appellants; (2) but that in relation to the issue as to Delmady's testamentary competency there was sufficient clear, convincing, and satisfactory proof to warrant the trial court's finding that at the time in question Delmady—

"did not possess sufficient active memory to be able to collect and comprehend, without prompting, the condition of his property, his relations to those persons who might properly be his beneficiaries and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other and be able to form a rational judgment in relation to them."

Consequently that finding must be sustained in view of the first rule of law stated in this opinion, and therefore the order must be affirmed.

*By the Court.*—Order affirmed.

RECTOR, J. (*concurring*). I concur in the result. I believe that there was insufficient mental competency to make a will, but I also believe that the trial court's finding of undue influence should be sustained.

Mr. Justice BARLOW joins in this opinion.