WILL OF WICKER: WICKER, Appellant, v. GUNDELACH and another, Respondents.

*November 1—November 28, 1961.*

For the appellant there was a brief by *Nikolay, Jensen & Scott* of Abbotsford, and oral argument by *John J. Nikolay*.

For the respondents there was a brief by *Schmidt & Schmidt*, attorneys, and *Gorman & Gorman* of counsel, all of Wausau, and oral argument by *David A. Gorman*.

HALLOWS, J. The test for testamentary capacity, as it is applied in Wisconsin, was originally taken from *Delafield v. Parish* (1862), 25 N. Y. 9. See *Holden v. Meadows* (1872), 31 Wis. 284. The rule has been stated in essentially the same form in many cases. The rule, as generally stated, is:

"The test is not whether the testator did the best or the wisest or the theoretically just thing in his will; but, Did he have sufficient active memory to collect in his mind and comprehend, without prompting, the condition of his property, his relations to his children and other persons who might properly be his beneficiaries, and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other, and be able to form some rational judgment in relation to them?" *Will of Butler* (1901), 110 Wis. 70, 78, 85 N. W. 678; *Will of Washburn* (1946), 248 Wis. 467, 474, 22 N. W. (2d) 512; *Will of Delmady* (1947), 251 Wis. 98, 28 N. W. (2d) 301; *Will of McLeish* (1932), 209 Wis.

417, 245 N. W. 197; *Will of Klagstad* (1953), 264 Wis. 269, 58 N. W. (2d) 636; *Estate of Cyborowski* (1955), 271 Wis. 126, 72 N. W. (2d) 713; *Will of Ganchoff* (1961), 12 Wis. (2d) 503, 107 N. W. (2d) 474.

The appellant contends Mrs. Wicker lacked testamentary capacity because she was afflicted with senile dementia and was laboring under an insane delusion that her husband was stealing from her and such insane delusion materially affected the disposition of her property in the will. A testator may meet all the requirements of general testamentary capacity and yet be held to be incapacitated because of an insane delusion.[1] In considering insane delusion, it is not necessary to diagnose the exact nature of the disease or incapability. It is sufficient to determine whether such an incapability did, in fact, exist and if so, did it prevent the testator from making a proper will. *Will of McGovern, supra,* headnote 1. While some courts have held if there is any evidence to support the testator's belief, however erroneous, such belief is not an insane delusion. This court has for many years held insane delusion may exist even though there was some evidence from which the testator might have formed his belief or judgment. *Ballantine v. Proudfoot* (1885), 62 Wis. 216, 22 N. W. 392. In *Estate of Bickner* (1951), 259 Wis. 425, 49 N. W. (2d) 404, this court stated, at page 433:

" 'In order to be an insane delusion the mistake must be one which is not based upon evidence; or at least without any evidence from which a sane man could draw the conclusion which forms the delusion. It is not merely a bias or prejudice. The justice or injustice of the will does not determine whether it is or is not the result of an insane delusion,' " quoting 1 Page, Wills (3d ed.), p. 295, sec. 144.

[1] *Will of Elbert* (1943), 244 Wis. 175, 11 N. W. (2d) 626; *Will of McGovern* (1942), 241 Wis. 99, 3 N. W. (2d) 717; *Will of Lundquist* (1931), 205 Wis. 667, 238 N. W. 861; *Estate of Knutson* (1930), 201 Wis. 526, 230 N. W. 617; *Will of Behm* (1925), 187 Wis. 10, 203 N. W. 718.

After reviewing the test applied in other jurisdictions, we said in *Will of Riemer* (1957), 2 Wis. (2d) 16, at page 21, 85 N. W. (2d) 804:

". . . the question before us is not whether there is any evidence on which Mrs. Riemer [the testatrix] could base her delusions, but rather whether there is any evidence from which a *sane* person could draw the conclusion which formed such delusions."

But proving the testator had an insane delusion is not sufficient. It must be further proved that the will made was affected by such delusion. As stated in *Will of Shanks* (1920), 172 Wis. 621, 179 N. W. 747, at page 624:

"It is not a question whether testator had general testamentary capacity, for many persons laboring under insane delusions may be competent to make a will (*Will of Cole,* 49 Wis. 179, 5 N. W. 346), but whether the insane delusion under which the testator suffered materially affected the will he made. In other words, is it reasonably certain that but for the insane delusion his wife could have received a materially larger devise? If that is reasonably certain, then mental incapacity is sufficiently shown to invalidate the will made."

During the last four years of her marriage to Tom Wicker, Lydia Wicker became extremely hard of hearing and wore a hearing aid. She was active for a woman of her age, took care of her own affairs such as marketing, collecting rent, giving receipts therefor, ordering coal, writing checks, and visiting socially. She read newspapers and magazines and discussed their contents. The evidence is conflicting on just how forgetful she was and the condition of her personal appearance, but it is clear that when she appeared in public Mrs. Wicker was presentable. She maintained two bank accounts and a safety-deposit box. One bank closed out her account because of difficulties with her, due, in part, to her hearing defect and the annoyance caused by her forgetfulness.

The evidence establishes she accused her husband on many occasions of having stolen or taken her hearing aid, glasses, keys, false teeth, and social-security checks. After Tom Wicker left the home, Mrs. Wicker no longer complained about losing such articles. Tom and Lydia had many arguments and on three occasions in 1958 and two in 1959 a law-enforcement officer was called to the home because of fighting. The chief of police testified he was called about once a month. On one occasion, shortly before Mrs. Wicker changed her will, Dr. Koch, the health officer, was called to examine an injury to Mrs. Wicker's finger received in a quarrel. He testified he thought Mrs. Wicker was suffering from senile dementia but admitted that on the two occasions he saw her, she was excited and he had no personal knowledge of her forgetfulness or of possession of other symptoms of that condition.

Tom Wicker testified that during the last four years his wife was hard to get along with because of her loss of hearing; that he would talk to her and she did not hear him, that he could not get along with her mostly because of her defective hearing and they had many arguments before he left the home in August of 1959; that on occasions, he swore at her, called her names, and on one occasion threatened to hit her; that he had his own checking account and she had hers and he did not help her with her accounts in 1958 or 1959; that in October of 1959 when he commenced the replevin action against her, there was no guardian appointed for her. Tom Wicker denied stealing the articles. Much more evidence could be detailed but what has been given is sufficient to characterize the testimony in the record.

The appellant contends the evidence was convincing that Mrs. Wicker had senile dementia evidenced by an impairment of memory. Not every aged person is a victim of senile dementia. Such a condition begins gradually and is progressive in character, and in its gradual advance to in-

competency it embraces a wide range of infirmity, varying from simple lapse of memory to a complete inability to recognize persons or things. Senile dementia must be distinguished from mere senility and a general weakness of vital powers. 44 C. J. S., Insane Persons, p. 27, sec. 2. Infirmities of old age, such as forgetfulness, incoherence, eccentricity, and even an occasional inability to recognize acquaintances, do not necessarily establish a want of testamentary capacity. *Will of Washburn* (1946), 248 Wis. 467, 22 N. W. (2d) 512; *Will of Grosse* (1932), 208 Wis. 473, 243 N. W. 465; *Estate of Knutson* (1957), 275 Wis. 380, 82 N. W. (2d) 196; *Will of Ganchoff* (1961), 12 Wis. (2d) 503, 107 N. W. (2d) 474.

We are not convinced from the proof that, at the time she executed her will, Mrs. Wicker was a victim of senile dementia because she was on occasions forgetful, argumentative, and untidy about her personal appearance at home. The evidence that she could handle her own affairs and did so, that she was neat and clean when she appeared in public, that she could carry on social conversations, and take care of herself when she was eighty-one years of age does not indicate she was suffering from senile dementia at the time she made the will in question in 1959. It may be that her senility as distinguished from senile dementia became worse, but two doctors, who examined her a year later, found her competent. True, when she was committed to the hospital a few months later, it was on the basis of mental incapacity, but this does not establish her lack of testamentary capacity conclusively at the time she executed the will.

Nor do we find substantial evidence that Mrs. Wicker was suffering from an insane delusion. The principal foundation for the appellant's contention is the accusing of her husband by Mrs. Wicker of taking her hearing aid, glasses, and other articles. There is no convincing evidence that

this was not true. One inference could be drawn that Mrs. Wicker mislaid these articles or that they were mislaid with the help of Tom Wicker. At least, there is little evidence Tom Wicker was kind and considerate enough of his wife to help look for the misplaced articles. Tom Wicker's own testimony is to the effect most of their arguments were because of Mrs. Wicker's defective hearing. The record shows no relationship between these parties at the time Mrs. Wicker executed the will or any action on Tom Wicker's part which would induce Mrs. Wicker to be generous with her separate estate toward her husband. Certainly, starting the replevin action by Tom Wicker against his wife for various articles is some indication that Mrs. Wicker's regard for her husband was reciprocal. Since Tom Wicker was the only other person in the house with Mrs. Wicker and they had engaged in numerous arguments and fighting, it was reasonable for Mrs. Wicker to believe her husband had either hidden, stolen, or removed the items she accused him of taking. We think a sane person could come to the same belief, even though erroneous.

Keeping in mind these people were of advanced years at the time of their marriage, that Mr. Wicker had a home of his own, the will does not seem to be an unnatural one in view of the evidence, but even if we considered it an unjust or an unnatural will, that fact alone would not necessarily be indicative of the result of an insane delusion. The question is whether the purported will expressed the testatrix's wish. Her right to devise and bequeath as she saw fit is superior to any of the rights of her husband. A will may not seem to be what it ought to be from a moral standpoint or what someone else might have done under similar circumstances, yet if the will expressed the testatrix's intention, it should be probated. *Will of Ball* (1913), 153 Wis. 27, 141 N. W. 8.

The trial court found that the dominant factor in inducing Mrs. Wicker to change her will was the constant quarreling and disagreement between the parties which was climaxed by physical violence, necessitating the services of a physician, some months before she changed her will. This is a reasonable view of the evidence and a finding which is not against the great weight and clear preponderance of the evidence and, therefore, will not be disturbed on appeal.

*By the Court.*—Judgment affirmed.