WILL OF KINTOPP: KINTOPP, Proponent, Respondent, vs. PIEPER and others, Appellants.

*April 7—May 13, 1947.*

For the appellants there was a brief by *Markham & Markham* of Horicon, and oral argument by *W. H. Markham.*

For the respondent there were brief by *Hartman & Hartman* of Juneau, and oral argument by *George G. Hartman.*

FRITZ, J.   The above-named appellants objected to the admission to probate of the instrument in question on the grounds that the execution thereof was procured by undue influence exercised by Arthur Kintopp and others, that at the time of such

execution the testator was not of sound mind and sufficient mental capacity to make a will, and that the instrument was not executed in the manner required by law. Upon the trial of the resulting issues, the court found that the instrument in question was duly executed by testator as his will in the presence of two subscribing witnesses in due manner and form; that at the time of said execution testator was mentally competent and had sufficient testamentary capacity to make a valid will; that no undue influence or fraud was used upon testator by Arthur Kintopp, Helen Kintopp, or anyone else to procure the making of the will, and neither of them had any special opportunity to exercise undue influence upon testator except as any ordinary member of a family has such an opportunity; that testator was not subject to undue influence but was strong-minded; and that, considering the services and employment rendered by Arthur Kintopp and Helen Kintopp during the lifetime of John Kintopp, no specific result favorable to Arthur Kintopp or Helen Kintopp appears in the will. Upon facts thus found and also stated in its written decision, the court concluded that the instrument in question is the last will of John Kintopp and entered the judgment admitting it to probate as such.

On this appeal appellants' counsel vigorously contends the evidence does not sustain the court's findings and conclusions and judgment. In passing upon such contentions there are applicable the rules that,—

"the relative credibility and weight of the testimony of the witnesses, and the corroborative values of the circumstantial evidence, were primarily for the consideration of the trial court; and its findings are not to be disturbed on an appeal, if there is sufficient credible evidence to sustain them, and no error prejudicial to appellant occurred in ruling on the admission of evidence." *Graham v. Zellers,* 205 Wis. 542, 544, 238 N. W. 385.

Upon our review of the record with those rules in mind, it is our conclusion that the findings and conclusions in question

were fully warranted and are not to be disturbed on this appeal in view of evidence which the court could consider credible and sufficient to establish the following.

The testator died on November 12, 1945. When the will was executed on December 9, 1943, he was about seventy years of age and living on a farm which he owned and lived on for many years. His daughter, Helen, lived in his household all of her life and did the housework and family nursing, and she testified she received no compensation other than the necessaries of life for her services rendered the family. Testator's son Arthur lived on or near testator's home all of his life and he and his wife did the farm work for testator, and for their services received $40 a month before 1943, $50 a month in 1944, and $60 a month in 1945. In 1943 Arthur was living a mile and a half from the testator's home. In 1943 testator's estate consisted of a one-hundred-twenty-acre farm, the assessed value of which with another forty-acre tract was $10,200; but there was a mortgage on the farm to secure $4,975. When he died the value of his livestock and farm equipment was about $6,000. The husband of the appellant Martha Pieper valued the land at $15,000, and the livestock and farm equipment at $9,000. Under the will there were bequests aggregating $575 to the three appellants who contested the will. In addition there were legacies aggregating $8,100 as follows: $100 and $3,000, respectively, to testator's sons Herman and Henry; $1,000 each to his grandchildren Evelyn and John Kintopp; and $3,000 to his daughter Helen to whom he bequeathed also his household goods. Thus the total amount of the legacies was $8,675, plus the value of the household goods. The residue of his estate the testator devised and bequeathed to his son Arthur; and the value thereof,—without considering possibly higher valuations than stated above, or deductions for payment of deceased's indebtedness, inheritance taxes, and the expense of probating the estate, etc.,—would apparently be about $2,550, after deducting from the above valuations of

$10,200 for the land, plus $6,000 for the livestock and farm equipment, the mortgage indebtedness of $4,975 and the specific bequests aggregating $8,675.

The instrument in question was drawn by Ernest H. Winter, the cashier of the nearby village of Lebanon bank since 1918, during which period he knew the testator, who transacted his financial matters with the bank and always indorsed his name with a cross (X). During several months before the will was actually drawn, testator's children Arthur and Helen had asked Winter two or three times to draw a will for their father, but they did not say how it was to be drawn. Finally a slip of paper was brought by Arthur to Winter as an outline of what it was claimed testator wanted put into his will. Winter threw the paper away, but subsequently he went to the testator's home and talked matters over with him at a time when Arthur was not present, although Helen was. Winter checked with testator regarding the slip of paper, and then Winter drafted the instrument in question at the bank in accordance with testator's instructions. At the time of the execution thereof there were present Winter, testator's daughter Helen, and Gust Drachenberg, a cheese maker who lived in Lebanon for about thirty years, during which period he knew and transacted business with the testator, who requested Drachenberg to be present. In their presence, as both Winter and Drachenberg testified, Winter, before the will was signed, translated it into German, and explained it sentence by sentence to testator, who said in German, "So ist richtig. So sollt sinn," both of which mean, as Winter testified, "the same thing, that is the way he wanted it." Then testator did not know at just what place he should put his cross, and Winter showed Helen where testator should put his cross and she assisted him by holding his hand while he made his "X" in the proper place indicated by Winter, who then himself wrote in the words, "John Kintopp, His Mark," and a special witnessing of the mark took place by Winter and Drachenberg as the attesting witnesses; and they then signed

the attestation clause in the presence of testator at his request after his declaring it to be his will, with all of the parties to the transaction, including Helen, being present in the room. Winter testified testator was of sound mind and acting under no restraint at the time of the execution of the will, and knew the amount of his property. Likewise, Drachenberg testified that from what he heard testator say and the way he talked and acted while present at the execution of the will, Drachenberg would say the testator was in his right mind; and that when he saw him two months before that his mind was as good as it always was. Dr. Sachse (called by appellants) testified he had known and treated testator as his physician for the last fifteen or sixteen years; that his diseases were diabetes, rheumatism, and chronic nephritis, which started about 1940; that he did not lose his memory or his mind until July or August, 1945, and after that would be classed as mentally weak; that he saw him on December 7, 1943, and in his opinion testator had enough resistance then to withstand influence, and was not subject to undue influence any more than any normal person; that as a result of his contacts with testator as his physician and from testator's physical condition and conversation, the witness would say that in December, 1943, testator was in full possession of his mental faculties and there was no impairment of his mental condition at that time that the witness could see; and that testator had a lot of will power in 1943, and ability to know what he wanted and to get what he wanted, and to recognize the character and extent of his property, the objects of his bounty, and talked about his children and grandchildren in 1943. Paul Pieper,—a brother of a son-in-law of testator,— testified he knew testator for some thirty years, and saw him in the fall of 1943 around at the threshing; that testator was at Pieper's place in 1943 and paid his own thresher bill and Pieper talked with him then and he was able to carry on a conversation with testator and understood what he said very clearly; and that Pieper did not think anybody could tell testa-

tor what he should do and not do. On the other hand, there was testimony to the contrary by witnesses called by appellants, including the answers to hypothetical questions by a physician who had not seen the testator. But as it was within the province of the trial court to pass upon the relative credibility and weight of all of the evidence, the court's determination and the judgment entered in respect thereto cannot be disturbed under the rules stated above. Consequently the judgment must be affirmed.

The appellants have taken· also an appeal from an order which denied their motion for a new trial based upon alleged newly discovered evidence, consisting of photostatic copies of testator's income tax reports for 1942, 1943, and 1944. In relation thereto it suffices to note that appellants stated in their affidavit that the purpose of using the reports as proof is to show the falsity and incredibility of the testimony (1) of the witness Winter who denied on trial that he had any recollection of preparing and witnessing income tax reports of testator ; and (2) of Helen Kintopp who testified falsely that she never received any wages from testator. The court denied appellants' motion because sufficient grounds did not exist for granting a new trial.

Appellants were not entitled to the relief sought on their motion for the reasons : (I) That there is no showing in their affidavits that they had used due diligence in seeking to discover the alleged newly discovered evidence in time for use on the trial, and that they were not negligent in failing to so discover it as is required by the rule stated in *Belt Line Realty Co. v. Dick,* 202 Wis. 608, 233 N. W. 762, and *Miller Saw-Trimmer Co. v. Cheshire,* 177 Wis. 354, 189 N. W. 465 ; (II) that the newly discovered evidence, even if considered most favorably to appellants, would be admissible merely in so far as it might be deemed to impeach the credibility of Winter's testimony that he had no recollection of making income tax reports· or witnessing testator's signature thereto, or of Helen Kin-

topp's testimony that she never received wages from her father; and as to evidence sought to be used for such purposes there is applicable the rule that "evidence which merely tends to impeach the credibility of a witness does not warrant a new trial upon the ground of newly discovered evidence" (*State v. Debs,* 217 Wis. 164, 166, 258 N. W. 173; *Sweda v. State,* 206 Wis. 617, 240 N. W. 369; *Birdsall v. Fraenzel,* 154 Wis. 48, 142 N. W. 274); and (III) that the newly discovered evidence is not of such character as would probably change the result of the trial, for, as is stated in *Toledo Scale Co. v. Colleran,* 212 Wis. 502, 504, 250 N. W. 377,—

"A showing of diligence must be made, and in order to justify a reversal of an order refusing a new trial it should appear that the newly discovered evidence is of such a character as would probably change the result of the trial."

Under the circumstances there was no abuse of discretion on the part of the court in denying the motion, and consequently the order must be affirmed.

*By the Court.*—The judgment and the order denying the motion for a new trial are affirmed.