WILL OF WRIGHT: MANSKE, Proponent, Appellant, vs. WRIGHT, Contestant, Respondent.

*January 8—February 2, 1954.*

For the appellant there was a brief and oral argument by *Edward T. O'Neill* of Fond du Lac.

For the respondent there was a brief and oral argument by *F. W. Cosgrove* and *C. P. Keck,* both of Fond du Lac.

CURRIE, J.   One who seeks to contest a will on the ground of mental incapacity has the burden to establish such facts by clear, convincing, and satisfactory evidence. *Estate of Bickner* (1951), 259 Wis. 425, 433, 49 N. W. (2d) 404. Therefore, on this appeal, the question before us is whether there is such clear, convincing, and satisfactory evidence as will support the findings of fact and judgment of the trial court.

The testator, John D. Wright, was sixty-eight years of age at the time of his death on September 5, 1952, and had been a bachelor all of his life. His father had died at an early

age and thereafter he had continued to live with his mother on a farm in Fond du Lac county until her death on February 12, 1948, at the age of ninety years. John had never gone farther in school than the third grade and his whole life seems to have been dominated by his mother until her death four years before his own. Several witnesses referred to the fact that he was not a "bright man," and one of the proponent's witnesses described him as "a lone wolf," and another witness as an "introvert." He was never known to have written a letter in his entire lifetime.

One of the witnesses for contestant was Mrs. Virginia Leake, a first cousin of John. Mrs. Leake is the wife of a surgeon and for some years, prior to July 1, 1951, the Leakes resided in Chicago and maintained a summer residence on Lake De Nevue near the Wright farm where they spent parts of summers and many week ends. After July 1, 1951, they resided permanently there upon Dr. Leake retiring from practice. Mrs. Leake described Mrs. Wright (John's mother) as "a very domineering woman" and stated that John "was tied to her apron strings" and could not do anything without her telling him to do so.

John had two brothers and no sisters. The contestant David Wright is one of said two brothers, being two years older than John, and the other brother, who was younger than John, was killed in World War I. David married and on December 8, 1927, David, his wife, and infant daughter departed for California, and thereafter David did not return to Wisconsin until he attended John's funeral in 1952. However, David testified that there was no ill feeling between the two brothers prior to David's leaving for California and that up until his mother's death in 1948, three or four letters each year were written to the mother and about an equal number were received from her each year. The letters in behalf of David were mostly written by his wife. A letter from the mother to David's daughter was offered and re-

ceived in evidence which had been written at the time of the daughter's marriage in 1947, which letter evidenced a cordial relationship between the two families.

About one year after the mother's death a noticeable change seemed to take place in John, which change became more accentuated as time went on. Prior to that time he had been generally regarded as a clean and neat man, but by 1950 he had become dirty and untidy in his personal appearance. One witness described the condition of his home in 1950 as filthy, and many witnesses testified to his dirty and unkempt appearance in the spring and summer of 1951. He became forgetful. This was evidenced by the fact that he would forget about food being on the stove so that it would burn, and he asked one witness about the state of health of the witness' father and mother although they had been dead for some years, a fact previously well known to John.

The proponent, Harold Manske, resided across the road from the John Wright farm, where Manske conducted a mink farm. The Manskes and Wrights had been good neighbors prior to old Mrs. Wright's death and after her death the Manskes had John over to meals and also Mrs. Manske would send over food, such as a newly baked pie on occasion. As time went on, John took more and more of his meals at the Manske home until he was eating about two meals per day there. However, in return for this, he helped Mr. Manske with work on the mink farm and John also permitted Manske to slaughter farm animals in buildings over on the Wright farm. Occasionally Manske helped John with some work John was doing. The meals and exchange of work were entirely on a gratuitous basis with no charge being made on either side.

For several years prior to his death, John rented his farm land to a pea-canning company except that he retained the hay and pasture lands and the use of his own farm buildings. He retained some cattle, including milk cows which he

milked, and some ducks. In 1950 he bought an expensive farm tractor for which he had no use and in order to pay for the same cashed in a life insurance policy, much against the advice of the life insurance agent who had sold the policy. During 1950 and 1951 he was unable to write out checks or make stub records of the same and Manske did this for him, John signing the checks. Manske also made out his income-tax returns.

By the spring of 1951, John was experiencing hallucinations, the nature of which will hereinafter be described. He complained of having pains in his head and dizziness and suffered from the shingles. He refused, however, to go to a doctor for treatment, but treated himself with cow medicine. His mental condition grew worse, and on December 5, 1951, he suddenly without warning attacked Manske at the latter's mink farm, grasping him by the throat. Upon Manske freeing himself, John threw stones at Manske.

Manske then joined with others in signing a petition under sec. 51.01, Stats., to the county judge of Fond du Lac county requesting that an inquiry be had to determine John's mental condition. The judge appointed two physicians to make an examination of John and their report is contained in the record on this appeal. This report discloses that John did not know the place or date of his own birth and had hallucinations such as that two men had been burning his lawn (which had not occurred), and that electric lights turned themselves on and off. It was the conclusion of the examining physicians that his mental condition was of gradual onset and they recommended treatment in an institution. John was not immediately committed but was permitted to return home. However, his condition continued to deteriorate and on June 11, 1952, he was committed to the Winnebago State Hospital for medical observation.

Dr. Petersik, superintendent of the Winnebago State Hospital, reported to the county judge by letter dated July 14,

1952, that diagnosis had been made of John's condition which was "psychosis with cerebral arteriosclerosis," and that his condition warranted commitment. Upon this report the county judge entered an order of commitment dated July 16, 1952, and John was an inmate of the Winnebago State Hospital at the time of his death on September 5, 1952.

With this background we now consider the immediate events surrounding the execution of the will dated July 9, 1951, propounded for probate by Harold Manske. John and Manske had an agreement that if John needed anything at night he was to ring a cowbell and Manske would come to his assistance. On the night of July 9, 1951, shortly before 10 o'clock, John T. Boyle, a young attorney residing in Fond du Lac, received a telephone call from one Marcoe, a justice of the peace. Marcoe informed Boyle that Manske had telephoned Marcoe that a neighbor of Manske's desired to make a will. Apparently Manske had requested Marcoe to draft the will, but Marcoe had referred the matter to Boyle. Marcoe gave Boyle directions for reaching the Wright farm, and stated that Manske would meet him there, and that he (Marcoe) would telephone Manske to inform the latter of such arrangement.

Boyle proceeded to the Wright farm home and was met outside by Manske who took Boyle into the farmhouse and introduced the latter to John Wright. Manske explained to Boyle that John had been taken ill earlier that evening and wished to draw a will. Boyle found John Wright lying on a couch covered by a coat or black robe, although it was a normal July evening. Boyle requested Manske to retire from the house, which he did, and Boyle then proceeded to question John in order to get the necessary information to draft the will. John stated that his property consisted of the farm and personal property thereon. When Boyle asked him if he had any relatives he stated that his only relative was his brother who lived in California whom he had not seen for many

years and that he did not want him to have any of his property. When asked the reason why, he stated that when his mother had become ill and died David *"was notified and made no response whatsoever,* cared nothing about him or his mother, and he wanted nothing to do with him, wanted him to have none of his property." John stated that he wanted $100 each to go to Carole Jean Manske (daughter of Harold Manske) and Diana Brennand who had done kind favors for him, and all the rest of his property he wanted to go to Harold Manske because he was a very good friend and the only one that ever did anything for him.

Actually, so far as any facts could then have been known to John, David had not been notified of his mother's death. At the time of Mrs. Wright's death, Mrs. Manske had inquired of John whether he wished anyone notified, and John replied, "No." Later, unknown to John, some relatives of Mrs. David Wright had sent David a newspaper clipping telling of his mother's death and funeral.

After Boyle had this talk with John, Boyle realized that Manske could not act as the other witness to the will, inasmuch as Manske was to benefit thereunder, so he summoned Manske and requested him to get another witness. Manske went to the home of a neighbor, Floyd F. Brennand (grandfather of Diana Brennand), who was asleep in bed. Brennand got up and dressed and returned with Manske to the Wright farm home.

In the meantime, Boyle had written out the will in longhand and, upon Brennand and Manske entering the room, Boyle proceeded to explain the terms of the will to John. John made no comment following such explanation, and raised himself on his elbow on the couch so as to write and signed his name to the will, and Boyle and Brennand signed as attesting witnesses. John was then asked if he could get upstairs to bed and he stood up and said that he could. Boyle, Manske, and Brennand then left. Neither Boyle nor Bren-

nand considered that John looked very ill the evening that the will was executed and both Boyle and Brennand testified that they considered that he was competent to make a will.

Among the lay witnesses called in behalf of contestant to establish John's mental incompetency to make a will were Miss Ethel Ward, Mrs. Frieda Barash, Elmer Schussman, Walter Krug, Sam Vandervort, and Mrs. Virginia Leake (hereinbefore referred to).

Miss Ward resides in the county of Fond du Lac, is a case worker for the county welfare department, and is an old friend of the Wright family, having known them for thirty or thirty-five years. Even after old Mrs. Wright's death, Miss Ward continued to make visits at John's home four or five times each year.

Mrs. Barash immigrated from Russia to Fond du Lac in 1921 with her husband, and for some years they have owned and operated a secondhand furniture store. Prior to undertaking such business they first engaged in the scrap-iron and junk business with a horse and wagon and made the acquaintance of the Wright family in about 1927 or 1928. The Barashes became good friends of Mrs. Wright and her son John and over the years frequently visited back and forth at each other's homes. For several seasons Mrs. Barash had a garden on the Wright farm and during the gardening season would go there once or twice a week, the last garden being in 1949. Thereafter she made several trips to visit John at his home, two of such occasions being in April and May, 1951.

Schussman was a neighbor of John's living on the same road 50 or 60 rods distant and had known John for some years. Schussman owned a small tractor and in 1950 and 1951 plowed John's garden plot for him, although John apparently failed to plant anything in 1950 after having the same plowed.

Krug was an employee of the Mammoth Springs Canning Company which had rented John Wright's farm for the 1951 season, and his work took him to the Wright farm on several occasions during 1951, affording him an opportunity to engage in conversation with John. In addition to such conversations, Krug found in one of the sheds in which he was going to put some canning company machinery, three or four dead cows partly decayed, which cows the canning company's employees had to pull out of the shed before placing their machinery therein.

Vandervort has been a life insurance agent in the city of Fond du Lac for over forty years and knew the Wright family for a period of thirty to thirty-five years. He was the agent who had sold the policy to John, which John cashed against Vandervort's advice in 1950 in order to buy the large tractor he did not need.

All of these witnesses, including Mrs. Leake, had conversations with John Wright during the spring or summer of 1951. In the conversations had with Miss Ward, Mrs. Barash, Schussman, and Krug, John told each that he had a black cat which spit fire out of its eyes. John also told Mrs. Barash, Schussman, Krug, and Vandervort that a white cow, which he actually did have, was the sacred cow of India, and to Krug he explained that such cow was worth $50,000 and the only one of its kind in this country. To Schussman and Vandervort he also told a story of having in the daytime slept out on a manure pile alongside his bull and his dog, and in so doing he was warm and comfortable. Schussman also related that on one evening in the summer of 1951, after the Schussman family was through eating supper, John came and rapped on the door of the garage in which Schussman was working and asked if Schussman had any raw beef in the house. John stated that the reason he wanted it was because when he had a heart attack he ate some raw beef with arsenic on it and that effected a cure.

In addition to telling Miss Ward about the cat which spit fire he told her in April, 1951, that "they" were trying to "burn me out here," and "they are around here nights with blowtorches" without identifying the people he referred to as "they." Some such hallucinations seem to have continued over the months because upon his examination by the physicians in the insanity proceedings in December, 1951, he had hallucinations about two men burning his lawn when, in fact, his lawn had not been burned.

Mrs. Leake testified that John told her in May, 1951, that he had two cows which had no hair on their bodies and that articles had appeared in farm publications describing them. She stated that he looked "wild" and was in a pitiful condition in so far as his personal appearance was concerned. Other witnesses testified to John's wild appearance and "glassy" stare.

These lay witnesses expressed their opinion that John was not mentally competent to make a will in July, 1951. The proponent Manske, on the other hand, called several neighbors and acquaintances of John who testified that in their opinion he was mentally competent on that date and several of such witnesses denied noticing any deterioration in his mental condition. However, Fred Supple, one of these witnesses who testified for proponent, did admit that John had talked to him about his "sacred" cow, but that Supple had just passed it over, thinking nothing of it. Mrs. Manske, who testified in behalf of her husband, made a rather damaging admission as evidenced by the following question put to her and her answer thereto:

"*Q*. Did he [John] do anything that would lead you to the conclusion or give any suspicion that he wasn't mentally right? *A*. No. I don't agree with the doctor. He would have those spells. I don't know if I should say that or not. He wouldn't feel good but then between them he would know just as much as anybody."

Dr. Karl K. Borsack is a Fond du Lac physician of many years' experience, being one of the two doctors who examined John in the insanity proceedings on December 7, 1951. It was his conclusion that John had a psychosis brought on by cerebral arteriosclerosis and that such condition was a gradual development brought on over a period of two or three years. He gave it as his opinion that John was not mentally competent on July 9, 1951. While a person affected merely with arteriosclerosis might have lucid intervals he did not believe that this was so in the case of a combination of psychosis and arteriosclerosis. It is to this latter testimony that Mrs. Manske apparently alluded in her testimony quoted above.

Dr. John E. Twohig, who was called as an expert witness by the proponent, testified on direct examination in response to a hypothetical question that he believed John was competent on July 9, 1951, when he made his will. However, on cross-examination, when a further hypothetical question was put to him stating some of the evidence given by witnesses for contestant, he stated that it was "very reasonable" that John could have been mentally incompetent on July 9, 1951.

Dr. R. H. Quade, also called as an expert witness by the proponent, testified that a person with arteriosclerosis will have lucid or normal periods.

Proponent also called Dr. Norman Becker as an expert witness but the trial court properly ruled that he was incompetent to testify under the provisions of sec. 325.21, Stats., because of having treated John in 1950 and his opinion was based partly upon observations gained from such professional attendance. Such ruling was made after Dr. Becker's testimony had been received subject to objection, and, even if no objection had been entered thereto, such testimony would have been insufficient to change the result in view of the overwhelming weight of the evidence that John was mentally incompetent in July, 1951.

On the basis of the foregoing summary of the testimony and evidence presented, we have no hesitancy in holding that the finding of the learned trial court, that testator John D. Wright, did not have testamentary capacity to execute the propounded instrument as his will on July 9, 1951, is amply supported by clear, convincing, and satisfactory evidence. Such finding is sufficient to sustain the judgment denying the propounded will to probate, thereby making it unnecessary for us to pass upon the issue of undue influence.

*By the Court.*—Judgment affirmed.