SPIEGEL and wife, Appellants, vs. SILVER LAKE BEACH
ENTERPRISES, INC., Respondent.*

*December 5, 1956—January 7, 1957.*

* Motion for rehearing denied, with $25 costs, on March 5, 1957.

For the appellants there was a brief by *Frank, Karl & Bessman* of Milwaukee, and oral argument by *Leonard Bessman.*

For the respondent there was a brief by *Burlingame, Gibbs & Roper* of Milwaukee, and oral argument by *Richard S. Gibbs*.

STEINLE, J.   We first consider the contention of the plaintiffs that the jury's finding that the defendant was not negligent in responding to the need of the plaintiffs' decedent for assistance, is not supported by credible evidence, and is contrary to the overwhelming weight of the evidence.

Some of the material facts are not in dispute, while others are.  It is undisputed that on July 12, 1954, Lavern Spiegel, eighteen years of age, went from Milwaukee to Silver Lake in Waukesha county with four other youths, Charles Gruber, twenty-four; Daniel Wisch, sixteen; John Seal, fifteen; and Donald Dwyer, seventeen.  Lavern Spiegel was not married and lived in Milwaukee with his parents, the plaintiffs.  He was a student at Concordia College in his home city, and had completed one year of a seven-year course of schooling for the ministry.  He also had been engaged as a part-time clerk in a paint store.  At the lake the five young men went to defendant's premises situated on the north shore, where the defendant operates a recreational resort for profit, which includes a swimming beach, picnic ground, a restaurant, and a roller-skating rink.

The beach faces south and is about 200 feet in width.  It is bounded by life lines extending into the water.  One of the lines extended for about 40 feet, the other for about 200 to 225 feet.  The lines slanted inwardly, and the distance between them narrowed the further they were extended in the water.  However the lines did not meet and were about 75 feet apart at their closest points.  There were two installations in the water for the use of bathers or swimmers.  One of these devices was a rotating type of structure known as a waterwheel, which was secured in position about 200 to 250 feet from the shore line where the water was approximately

four and one-half feet in depth. The other installation was a raft, 16 feet square, upon which there was a diving board. The raft was anchored in position about 300 to 400 feet from the shore line in water about 10 feet deep. There was no rope, barrel, or other obstruction to prevent a swimmer from proceeding directly to the raft without being impeded. There was a depth marker at the end of each of the lines.

The defendant furnished lifeguards who took positions at various places at the beach,—one being on a platform, another on top of the boathouse, and another on the beach itself, the last being for the observation of children. The distance between the guard position on the top of the boathouse and the raft was between 350 to 400 feet. When there was but one lifeguard in attendance, he customarily occupied a place on either the platform or the top of the boathouse.

The youths arrived at the beach at approximately 7:30 p. m. They purchased swimming tickets at 40¢ each. An attendant stamped their arms to show that they had paid for their admission. They entered the water about ten minutes later. This was the first time that Lavern Spiegel and Charles Gruber had been to this beach. They stayed in the shallow water near the waterwheel while Daniel Wisch, John Seal, and Donald Dwyer swam to the raft. Thereafter Wisch swam back to Spiegel and Gruber, and all three started to swim toward the raft, with Spiegel in the center and about three to six feet away from each Wisch and Gruber. Spiegel swam for only 10 to 15 feet after reaching water beyond his depth, when he floundered,—struggled and gasped for air. Gruber swam toward Spiegel when he noticed Spiegel in distress, called out for help and for a lifeguard, took ahold of Spiegel and tried to hold him up. Notwithstanding such assistance, Spiegel went down. Gruber brought Spiegel to the surface and Wisch took ahold of his arm. Seal and Dwyer who were on or near the raft heard the cries for help and saw Spiegel struggle in the water. The estimated dis-

tance from the raft to the place where Spiegel was struggling was about 30 to 40 feet. Seal and Dwyer left the raft and swam to Spiegel's aid. The several youths, however, were not able to keep Spiegel above the surface, and he sank in water about 10 feet deep.

The evidence as to events occurring after the cry for help went forth as Spiegel was observed to be in distress, is conflicting. The rule is well established that a finding of a jury is not to be set aside by the court unless there is no room to draw a conflicting inference. *Thorp v. Landsaw* (1948), 254 Wis. 1, 8, 35 N. W. (2d) 307. The weight and credibility of the evidence were considerations for the jury. Several witnesses presented by the plaintiff at the trial testified that a period of ten minutes or more elapsed between the time of the first calls for help and the arrival of the lifeguard at the place where Spiegel had found himself in difficulty. However, in a matter as presented, it is not the function of the court to weigh the disputed evidence, but to determine whether there is credible evidence which under any reasonable view supports the findings. As said in *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 109, 62 N. W. (2d) 549: "It is the well-recognized rule that when a jury's findings are attacked, particularly when they have had the trial court's approval, our inquiry is limited to the issue whether there is any credible evidence that, under any reasonable view, supports such findings. With the rule in mind we consider that it is necessary to recite only the testimony which supports the jury's findings. Some of it is in dispute, but as to the disputed testimony we must recognize that it was for the jury to determine where the truth lies." See also *Heibel v. Voth* (1955), 271 Wis. 350, 353, 73 N. W. (2d) 421.

Dominic DeCicco testified in part that he is the president of the defendant corporation, and that he acts as a lifeguard at the beach. On July 12, 1954, he came on duty as a lifeguard at 6:30 p. m., and determined that one guard was

sufficient in view of the number of swimmers present. He made a water patrol to determine whether the raft, life lines, and the beach properties were in good physical condition, and then took a watch position on the platform. At about 7:10 p. m., he moved to the position on top of the bathhouse from which one could see the entire spread of the beach. He kept watch there until he heard someone from the direction of the waterwheel yell "Guard." That incident occurred between 7:30 and 7:45 p. m. He immediately ran to the beach, launched a boat, and rowed in the general direction from where the call came. He observed a youth floundering in the general area of the raft and rowed toward that place. When about 20 feet from the northeast section of the raft, he came upon a boy who told him that his buddy had been down about two minutes. He dived into the water immediately and searched the bottom without success. He came to the surface, called in to the shore with instructions to notify the sheriff's department. He asked for volunteers to assist in the search. They came from the raft and from the shallow water. They combined to form a chain, and proceeded to search the entire bottom from the raft toward the shore for a distance of about 35 feet, without success. The witness testified that he continued to dive and search, and that he found the body about twenty minutes after he had arrived at the scene.

Edwin H. Rohloff testified that he had been fishing in a rowboat, and that while returning to shore and when 35 feet from the raft, he observed a young man calling for help from the raft. Others around the young man seemingly paid little attention to him, and the witness was in doubt as to whether the distress call was genuine. There were about seven men on the raft, and just previously the sounds coming from there were "Just the usual din of the swimmers." However, Rohloff rowed closer to the raft and ascertained that a person had gone down about 15 to 20 feet north of the center of the raft. He rowed to the raft, anchored the boat,

faced the beach and called toward shore for help. He observed the guard run down the steps and get into a boat. There were people around the shore evidently relaying the message for help. He observed the guard as he was diving for the body and also noticed the search that was made by those in the chain.

Romeo Dauphinais testified that he had been atop the bathhouse for about twenty minutes, and that during part of said time he was talking with DeCicco as the latter kept gaze on the swimmers in action. He heard a call for a lifeguard. He determined that the call came from the direction of the float. DeCicco immediately ran down to the beach, jumped in the boat, took off his sports shirt, and headed into the area.

Milton W. Wolff testified that he was paddling around in shallow water about halfway between the boathouse and the raft "when somebody said that someone was in distress, but there was so much noise that no one paid much attention to it." As he turned toward the raft "there was the kind of noise that young folks make, like shouting." The witness yelled to the guard who immediately thereafter rushed down from atop the dressing house, jumped into the boat, went to the scene, and dived into the water from the boat.

DeLaine Wolter, who collected admission fees from patrons using the beach, testified that she heard one cry for help and that DeCicco immediately rushed from the bathhouse, "down to the water, got into the boat, and went out there."

We are constrained to determine that the evidence referred to is sufficient to support the finding of the jury that the defendant was not negligent in responding to the need of Lavern Spiegel for assistance.

The plaintiffs also assign as error three items in relation to the questions in the special verdict pertaining to the negligence of Lavern Spiegel. They contend that it was error on the part of the court to have submitted the question of

contributory negligence, for the reason that the evidence was insufficient to create an issue of fact with respect to any such negligence; further, that there is no credible evidence to sustain the causal question submitted in connection with the contributory-negligence question; and also, that the court ought not to have instructed the jury with reference to contributory negligence, as there was no evidence to support the submission of such instruction.

As these matters are interrelated, we shall consider them together.

Specifically the jury found that Lavern Spiegel was negligent in leaving a place of safety and entering deep water, and that such negligence was a cause of his death.

Counsel for the plaintiffs argue that there is no credible evidence from which a reasonable inference can be drawn that Spiegel was not competent to undertake swimming in water over his depth; that the cause of his predicament is unknown; that whether he suffered from cramps, indigestion, or other form of distress, cannot be told; that this was his first visit to the defendant's beach, and that there were no ropes or obstructions to warn him that he was entering deep water or to prevent him from attempting to swim to the raft; that a deceased person is presumed to have exercised ordinary care in all respects, and that no evidence was presented upon which an inference of negligence can be drawn to overcome the presumption; that an instruction as requested with respect to such presumption, ought to have been submitted to the jury; that the instruction relating to contributory negligence ought not to have been given, since it was not supported by evidence, and since it caused the jury to bring in an improper verdict.

A careful examination of the evidence reveals several items from which the jury could reasonably infer that Spiegel was an inexperienced swimmer, and that he entered the deep water at his peril. Four of his companions testified that upon

entering the lake, Spiegel and Gruber remained in the shallow water, while the others proceeded immediately through the shallow water and into the deeper water to the raft. Later, Wisch swam from the raft through the deeper water until he came back to Spiegel and Gruber. It appears that when these three started for the raft, Spiegel was in the center and was rather close to the other two. The jury may well have inferred that such arrangement was due to Spiegel's knowledge that he was to proceed through deep water,—a situation to which he was not accustomed when swimming, and that his companions were aware of or sensed his lack of skill or efficiency in so doing, and that he was placed between them in order that they might protect him should he find himself in distress. True, while there were no ropes, drums, or buoys to warn of entrance from shallow water to deep water, or to prevent one from swimming into deep water, there were depth markers on the lines which an intelligent person unable to swim well could easily have noticed and should have observed. Coupling these items with Spiegel's actual experience when he swam for 10 or 15 feet in deep water and floundered, and considering that there was no evidence that Spiegel was a competent swimmer, we are obliged to conclude that the evidence referred to was sufficient upon which the jury was entitled to have based a reasonable inference that Spiegel was proceeding with knowledge of the danger to himself. The plaintiff, Martin Spiegel testified that when previously the son had gone swimming in a lake, he always remained close to shore and in shallow water. True, the times when the father made such observations were not stated by him. The jury may well have inferred that such conduct on the part of the son continued up to the time of the unfortunate incident on July 12, 1954, and that it was due to his incompetency as a swimmer in water over his depth. Such inference is based on fact, and not on conjecture. The presumption that the deceased exercised ordinary care

for his own safety was eliminated when the evidence in this regard was introduced. In *Atkinson v. Huber* (1955), 268 Wis. 615, 618, 619, 68 N. W. (2d) 447, it was said:

"This court is committed to the doctrine that where, in a negligence case, evidence is introduced which would support a jury finding contrary to the presumption that a deceased person . . . exercised due care for his own safety, the presumption is eliminated and drops out of the case entirely and no instruction upon that subject should be given to the jury. *Fiedler v. Kapsa,* 255 Wis. 559, 39 N. W. (2d) 682; *Kreft v. Charles,* ante, p. 44, 66 N. W. (2d) 618, . . . to have given the instruction, . . . would have been prejudicial error."

We find no merit to the plaintiffs' various contentions regarding the court's submission to the jury of the inquiry as to Spiegel's negligence.

The plaintiffs also maintain that the damages fixed by the jury are so inadequate that considered in connection with other circumstances, they indicate that the verdict was perverse. The jury fixed the damages for loss of society and companionship at $1,000. Its answer to the question as to a sum that the parents would probably have received from the son after his majority and during their life had he survived, was $0. One of the circumstances referred to by the plaintiffs in connection with this contention, relates to the court's ruling during the trial that plaintiffs' counsel was not permitted to read to the jury from an American Red Cross manual entitled "Life Saving and Water Safety," after the defendant's lifeguard in adverse examination had testified that in his opinion the presence of one guard was sufficient to protect the swimmers at defendant's beach at the time in question, and that he was familiar with the contents of the manual and adopted the same in so far as it was applicable. Counsel for plaintiffs take the position that the purpose of desiring to read from the manual was to impeach the testi-

mony of the defendant's lifeguard. We treat of this subject later in this opinion. The other circumstances alluded to by the plaintiffs in their charge that the verdict was perverse relate to the court's submission of the question of contributory negligence, and the instruction in connection therewith.

The evidence indicates that the plaintiffs are in good financial circumstances. They have accumulated property, and the husband holds steady employment, although at times he is not able to work (for periods not stated) because of a weak back. He will be eligible for social-security payments and participation in his employer's profit-sharing program. The evidence indicates that it was the parents' plan that the son would have lived at home for one year more, and that his schooling thereafter would have been at places away from Milwaukee for five years. While he was not engaged to be married at the time of his death, he was keeping steady company with a young lady. The father expected that he would bear the major part of the expense for the son's maintenance and tuition while he was in school. It does not appear that such payment was to be advanced in the form of a loan. From his occasional earnings the son purchased gifts for the family such as a steam iron, a bathroom scale, vise, etc. He had told his parents that he would help them sometime —as much as he could. While the amount for loss of companionship might have been fixed at a higher sum, which we would have approved, we cannot declare that it was so insufficient as to indicate perversity. Considering the financial help which the father expected to furnish to the son until he reached the age of twenty-four years, and considering the profession to which he was aspiring, the realization of which would probably not have enabled him to do much more than support himself, a wife, and family, we are not able to hold that the jury's determination with respect to probable contributions by the son to the parents indicated perversity. The

matter of damages is peculiarly within the discretion of the jury. *Boyle v. Larzelere* (1944), 245 Wis. 152, 13 N. W. (2d) 528.

Since the submission of the question of contributory negligence was not error, it cannot be said that its consideration by the jury was prejudicial to the extent of perverting the jury's determination, nor can we find that the refusal of the court to permit the plaintiffs' counsel to read to the jury excerpts from the American Red Cross manual influenced the jury's decision to the extent of causing it to be perverse, since there is nothing of record to indicate the portion of the content of the manual which the counsel desired to present for the jury's consideration. In their appendix upon this appeal plaintiffs' counsel include a quotation from the manual which they assert was the portion they desired to read to the jury. There was no offer at the trial of such exhibit, and we are not at liberty to regard the same.

In his adverse examination upon the trial the defendant's lifeguard, Dominic DeCicco, testified that in his opinion the presence of one lifeguard gave sufficient protection to swimming patrons under the circumstances, and that he was familiar with the American Red Cross manual entitled "Life Saving and Water Safety," and used it as a textbook in so far as it was applicable; that beaches are of different types. The manual was marked as an exhibit for identification. After being so marked, counsel for plaintiff then stated before the court and jury: "I am going to read from page 48, the second paragraph, the heading of which is Organized Bathing Beaches." Opposing counsel interposed objection to such reading on the ground that the manual was a scientific book and its content constituted hearsay. The court heard the arguments of counsel in chambers with reference to their positions in the matter. When returning to the courtroom, the court sustained the objection. On this appeal error is

assigned in that the court refused to the plaintiff the right to impeach the defendant's witness by not permitting a reading of the statement from the manual which was contradictory to the testimony that the witness had given. The exhibit was not qualified nor was it offered in evidence. No offer of proof was made as to the portion of the content of the manual which the counsel desired to read. It is the rule as stated in 6 Jones, Commentaries on Evidence (2d ed.), p. 4998, sec. 2526, that:

"When an objection to evidence is sustained and evidence is rejected, if prejudice to the party seeking to introduce the evidence is not self-apparent, in order to save the point on appeal it is necessary for such party to make his record by making an offer of proof of those matters of the proof of which he has been deprived by the ruling of the trial court."

Such rule was given approval by this court in *Pick Foundry v. General Door Mfg. Co.* (1952), 262 Wis. 311, 325, 55 N. W. (2d) 407.

For the reason that the record was not preserved as to this particular, we must hold that we are not in a position to pass upon the same.

*By the Court.*—Judgment affirmed.