WILL OF GANCHOFF: GANCHOFF and another, Appellants, v. VAN and others, Respondents.*

*January 11—February 7, 1961.*

* Motion for rehearing denied, with $25 costs, on April 4, 1961.

For the appellants there was a brief and oral argument by *Francis H. Reiske* of Milwaukee.

For the respondents there was a brief by *Houghton, Bullinger, Nehs & Houghton,* and oral argument by *Kenneth F. Hostak* and *Bauer F. Bullinger,* all of Milwaukee.

FAIRCHILD, J.   1. *Execution of will.* Appellants do not challenge the finding of the county court that the will was properly executed.

2. *Testamentary capacity.* Mr. Ganchoff was under guardianship. The record of a hearing on September 5, 1958, shows that he knew his own age, but had forgotten what month it was and who was President, and was confused about what he had eaten for breakfast. The record of a hearing on June 1, 1959, indicates that he was uncertain of the identity of two attorneys present who had drawn the two February wills. He was confused about various other facts, but identified his sons and daughter, spelled correctly some of the words the judge pronounced, and gave correct answers to a few arithmetic problems.

Dr. Jefferson, the psychiatrist who examined Mr. Ganchoff on February 23, 1959, testified that he was feeble, and needed the physical support of his sons to get to the doctor's office; that there was no evidence of any mental impairment with the exception of some defects in memory which were compatible with his years and general physical status; that Dr. Jefferson had no reason to believe his condition would have been different on February 24th; that Dr. Jefferson saw him again on October 21, 1959, and his condition was essentially the same physically and mentally. Dr. Jefferson

testified that in his opinion Mr. Ganchoff, on February 23 and February 24, 1959, was of sufficient mentality to know the size of his estate and the objects of his bounty, and retain the same a sufficient length of time in order to form an opinion and an idea with regard to them.

Mr. Jursik, the attorney who drew the will of February 24th, and was a witness at its execution, saw Mr. Ganchoff twice that day. In response to a telephone call from Pauline, Mr. Jursik called at the home shortly after 8 o'clock in the morning. Except for a short time at the beginning of the interview, Mr. Jursik and Mr. Ganchoff were alone. Mr. Ganchoff told Jursik that he had been with his sons the day before, had been taken to some offices, had signed papers but did not know if he signed a will, and wanted to know if the 1957 will was still good. Jursik explained that if he had signed a will, the later one would be effective. Mr. Ganchoff recalled that in the 1957 will, he left everything to his wife, but if the wife died first then he gave $5,000 to John, $5,000 to Paul, and everything else to Pauline. He said he wanted his property to go that way. Jursik testified that Mr. Ganchoff said, in effect, "I want Pauline to get the most of it because she is a good daughter. She takes good care of me. She is with me all the time. She keeps me clean. She makes my meals. She makes me good food, food the way I like it."

In response to questions, he stated his age correctly; said that his wife was dead, but he did not know when she died; that he did not remember his address. He correctly named his children, and the correct month, but did not know the year, and had forgotten who was President. He said his house was worth $18,000, and the land behind it was worth $18,000. Actually, the house had been appraised in Mrs. Ganchoff's estate at $20,000, and the land at $36,000. The land was sold the month after this conversation for $35,000. Mr. Ganchoff said he had some savings, but did not know how much. The amount was apparently some $400. Later

in the interview, he correctly stated the year, and the names of the President and Vice-President.

Jursik returned about 2 o'clock with the will he had drawn, and with his secretary, Miss Thomas. They sat alone with Mr. Ganchoff. Jursik asked questions similar to those in the morning, and Mr. Ganchoff gave correct answers, except that he again valued the land at $18,000. Jursik pointed out it had been appraised for more, but Ganchoff said he thought it was worth $18,000. After Jursik read the will, Mr. Ganchoff said he understood it, and it was executed. Mr. Jursik testified that in his opinion, Mr. Ganchoff had sufficient mental capacity to sign a will.

Miss Thomas corroborated Jursik as to the afternoon conversation. It was her opinion that Mr. Ganchoff's "mind was sound. He knew what he was doing and his memory was correct."

Three months after the will was executed, on May 22, 1959, the sons executed a petition for termination of the guardianship. They alleged that, he "is presently competent to have the care, custody, and management of his person and estate."

"The general rule, often expressed by this court, is that the test of mental competency is whether testator had sufficient active memory to comprehend, without prompting, the condition of his property, his relations to those who might be his beneficiaries, and to hold these things in mind long enough to perceive their relations to each other and to be able to form some rational judgment in relation to them." [1]

An objector has the burden of establishing lack of testamentary capacity by clear, convincing, and satisfactory evidence. [2]

---

[1] *Will of Williams* (1950), 256 Wis. 338, 346, 41 N. W. (2d) 191.

[2] *Will of Wright* (1954), 266 Wis. 89, 62 N. W. (2d) 409.

"The infirmities of old age, such as forgetfulness, incoherence, eccentricity, and occasional inability to recognize acquaintances, do not necessarily establish want of testamentary capacity. *Will of Washburn,* 248 Wis. 467, 474, 22 N. W. (2d) 512; *Will of Grosse,* 208 Wis. 473, 479, 243 N. W. 465. The appointment of a guardian for testatrix two months after she made the will is not of controlling weight, not only because of the time difference, but for the further reason that a finding of incapacity to manage property sufficient to warrant guardianship does not necessarily negative testamentary capacity." [3]

The evidence amply supports the finding of the county court that Mr. Ganchoff had testamentary capacity.

3. *Undue influence.* An objector has the burden of establishing undue influence by clear, satisfactory, and convincing evidence. [4] The four elements which must be shown in order to establish undue influence are familiar. [5]

(a) *Susceptibility.* The county court was of the opinion that Mr. Ganchoff was not susceptible to undue influence. It is difficult to understand, however, how such different wills could be made on successive days under these circumstances if neither was the result of undue influence. While the question of admitting the will of February 23d to probate is not before us, the question in this case approaches being: Which of the two wills was the result of undue influence?

(b) *Opportunity.* Pauline had the opportunity to exercise undue influence, and the county court so found.

(c) *Disposition to exercise undue influence, and a will the result of undue influence.* There was evidence tending

---

[3] *Estate of Knutson* (1957), 275 Wis. 380, 385, 82 N. W. (2d) 196. See definition of "incompetent" for the purpose of appointment of a guardian. Sec. 319.01 (3), Stats.

[4] *Kuehn v. Kuehn* (1960), 11 Wis. (2d) 15, 30, 104 N. W. (2d) 138.

[5] *Will of Freitag* (1960), 9 Wis. (2d) 315, 317, 101 N. W. (2d) 108.

to show a disposition to exercise undue influence on the part of Pauline, and the will of February 24th was substantially more favorable to her than to her brothers. On the other hand, there was evidence tending to show disposition on the part of the brothers to exercise undue influence, and the February 23d will, while treating all the children alike, was more advantageous to the brothers than the 1957 will which the February 23d will would have revoked. In resolving the conflict, we assume that the trial court was greatly persuaded, as we are, by two facts:

1. There is a plausible, although not conclusive, explanation of why Mr. Ganchoff favored his daughter, and

2. The plan of distribution in the February 24th will was the same as the plan of ultimate distribution in the 1957 wills of both husband and wife.

The question before this court is whether the weight and quality of the evidence tending to show the exercise of undue influence by Pauline are such that the findings of the county court are against the great weight and clear preponderance of the evidence. We conclude that they are not.

In addition to the facts already stated, we set forth a number of instances where there was conflict in the evidence, or conflict in the inferences to be drawn therefrom:

Appellant sons stressed the fact that it was Pauline who telephoned Attorney Jursik to come and draw the will of February 24th, yet it was they who had taken their father to an attorney who drew a will the previous day.

The sons testified in substance that Pauline made it difficult for them to visit their father. She testified that her father said a number of times that he feared his sons, and at one time said he did not want to see John; that in August, 1958, Paul had taken his father away from his home. Pauline called the police. Paul produced the father at the police station. The police officer testified that it was not a

police matter "in view of the fact that the father wished to remain with him."

There was testimony that at a gathering of the families of the sons on Thanksgiving Day, 1959, Mr. Ganchoff said he wanted his estate divided equally among his children and that "Mother [his wife] didn't do right." Pauline's daughter testified that on numerous occasions, including February 24th, after Mr. Jursik left, Mr. Ganchoff said, "I want everything the way Mom put things." Pauline's husband testified to similar statements, and that when the sons brought him home on Thanksgiving, "he said that 'all I did was answer questions today.'" There was testimony by the sons that while Mr. Ganchoff was still alive, Pauline and her brothers discussed the division of his property after his death, and that after a while these negotiations came to nought because of Pauline's demands.

It also appeared that Pauline had received some $9,000 at the time of Mrs. Ganchoff's death as a result of a savings and loan account in joint names. In 1950, an account had been opened by Mrs. Ganchoff payable to her or her husband. On February 6, 1958, when the balance was $9,961.80, Mrs. Ganchoff and Pauline went to the savings and loan association and caused the account to be transferred into the names of Catherine P. Ganchoff and Pauline Van, in joint tenancy and to the survivor of either.

On March 5, 1959, John and Paul petitioned the county court, alleging that the account was in two names only for convenience, and not in order to create a right of survivorship in Pauline. They sought an order declaring that this money was part of the estate. The county court decided that the account was truly joint, finding, among other things, that Pauline had given up her position as a practical nurse earning $55 per week to take care of her mother, at one time for six weeks, and at another time for six months; that Mrs.

Ganchoff had given money to the two sons to help them at various times.

The sons argue that the February 24th will appears to be the result of undue influence because Pauline had already been compensated for the services she had rendered—she had received more than $9,000 under the savings and loan account, and this would more than compensate her for taking care of her mother—under the guardianship she had received $210 plus rent-free living space. Pauline argues that her services plus food and other things furnished were worth more than the $210 plus rent. She stresses the constant attendance which her father's condition required, and the undesirable details of complete bodily care. Granting, however, that Pauline may have been fully compensated for what she would have earned elsewhere during this period, it does not necessarily follow that the amount allowed represented the value of the full-time service which she gave. Furthermore, we are not concerned with recovery of the value of services under *quantum meruit*, but whether it was probable that her father would not have made the will but for the exercise of undue influence. It seems entirely reasonable that the generous provision intended for her, first by her mother and father together, and later by her father, was a genuine expression of gratitude toward her. It is certainly not necessarily a result of undue influence.

It should be remembered also that the county court saw and heard the witnesses, including Pauline and her brothers, an advantage we do not have. The county court's finding was sufficiently supported by evidence.

4. *Exclusion of testimony.* Appellant sons claim that the county court erroneously excluded testimony in two instances. In neither instance, did appellants make an offer of proof, and we can only speculate as to what the testimony would have been.

"Furthermore, it was incumbent upon counsel to make an offer of proof as to the rejected testimony as a condition precedent to this court passing on this alleged erroneous ruling on evidence. *Plainse v. Engle* (1952), 262 Wis. 506, 56 N. W. (2d) 89, 57 N. W. (2d) 586; and *Langer v. Chicago, M., St. P. & P. R. Co.* (1936), 220 Wis. 571, 580, 265 N. W. 851. This is because without such offer of proof this court cannot determine whether the exclusion of the offered evidence was prejudicial, even though such ruling may have been erroneous." [6]

Although this court has, in the interests of justice, relaxed this rule in its application to particular circumstances, we do not deem that the interests of justice require such relaxation here.[7]

The two instances where rulings of the county court are challenged are as follows:

(a) Counsel for appellants said, "We are prepared to offer proof on the execution of the will of February 23, 1959, . . . for the purpose of offering it for whatever inference the court can draw on the ground of undue influence because the terms are so different." The court received in evidence the instruments dated February 23, 1959, and January 25, 1957, for the purpose of showing a possible pattern, but declined to accept testimony as to the execution of either.

Apparently the court was willing to assume, for the limited purpose stated, that the two previous wills had been properly executed. Proof simply of the facts of execution of the will dated February 23d would have added nothing. If counsel meant that the suggested testimony would go further, he did not make that clear.

[6] *Findorff v. Findorff* (1958), 3 Wis. (2d) 215, 226, 88 N. W. (2d) 327. See *Spiegel v. Silver Lake Beach Enterprises* (1957), 274 Wis. 439, 452, 80 N. W. (2d) 401.
[7] See *Kirkpatrick v. Milks* (1950), 257 Wis. 549, 554, 44 N. W. (2d) 574.

(b) Counsel for appellants asked Dr. Jefferson, who was called as a witness for appellants: "Did you have any conversation with Mr. Ganchoff as to the disposition of his estate?"

The county court sustained an objection, apparently on the ground that these conversations were privileged communications between patient and physician. Appellants made no offer of proof, either that Dr. Jefferson would have answered "Yes," or as to the substance of a conversation, if there was one.

It is conceivable that Mr. Ganchoff may have made statements to Dr. Jefferson, or to others on February 23d concerning the manner in which he desired his estate to be distributed. Such statements, including whatever directions he may have given for the drafting of the will of February 23d, would, together with evidence of the circumstances under which they were made, have been relevant and helpful in deciding whether the will of February 24th was the expression of Mr. Ganchoff's freely formed wishes, or was the result of undue influence. If competent proof of Mr. Ganchoff's statements of February 23d and surrounding circumstances had been offered, it should have been received. Appellants have had the benefit of consideration of the will of February 23d and the assumed fact that Mr. Ganchoff signed it under no duress or undue influence apparent to the subscribing witnesses. We assume that if the testimony of Dr. Jefferson or other witnesses available to counsel would have importantly strengthened the case, counsel would have made a full offer of proof.

Whether it was error to hold that Dr. Jefferson was forbidden by sec. 325.21, Stats., to disclose his talk with Mr. Ganchoff is an interesting question which we do not deem necessary to decide in the absence of an offer of proof.

Sec. 325.21, Stats., provides that no physician or surgeon shall be permitted to disclose "any information he may have

acquired in attending any patient in a professional character, necessary to enable him professionally to serve such patient," with certain exceptions not here material.

Under an older form of the statute, this court decided that a physician may testify as to information obtained upon examination of a person in order to determine mental competency, with a view to an application for release from guardianship and not in order to prescribe a remedy.[8] The statute then prevented disclosure by a physician of "information . . . necessary to enable him to prescribe for such patient as a physician."

It has been argued here that the present statute is more inclusive, and that since a physician renders professional service when he gives a professional opinion even though he does not attempt a remedy, the statute is now broad enough to prevent disclosure in cases like the present one.

It seems arguable, however, that where one submits himself to a doctor's examination for the purpose of determining whether he has testamentary capacity, it may be implied that the patient intends, even if he fails to give express consent, that the doctor be free to testify if, in fact, a will is executed in reliance upon the doctor's opinion that the patient has testamentary capacity.

In this case, Dr. Jefferson was permitted to testify to the observation he made, and to the opinion he held. He was not permitted to testify to conversations which were undoubtedly a part of the examination. We are not satisfied that it was consistent to permit him to testify as to his observations and opinions, but not as to these conversations. In any event, as previously stated, we do not decide these questions in this case.

*By the Court.*—Judgment affirmed.

---

[8] *Will of Bruendl* (1899), 102 Wis. 45, 78 N. W. 169.